CASE NO. 11-8092

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

WADE JENSEN and DONALD D. GOFF, individually and
on behalf of all others similarly situated,

*Plaintiffs-Appellants*,

v.

SOLVAY CHEMICALS, INC., SOLVAY AMERICA, INC.,
and SOLVAY AMERICA COMPANIES PENSION PLAN,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the District of Wyoming
The Honorable Alan B. Johnson
C.A. No. 2:06-cv-273-ABJ

PLAINTIFFS-APPELLANTS' OPENING BRIEF

Stephen R. Bruce
Allison C. Pienta
STEPHEN R. BRUCE LAW OFFICES
805 15th Street NW, Suite 210
Washington, D.C. 20005-2271
(202) 289-1117
stephen.bruce@prodigy.net
acaalim@verizon.net

Richard H. Honaker
HONAKER LAW OFFICES, LC
214 Winston Drive
P.O. Box 366
Rock Springs, WY 82902-0366
(307) 362-5800
honakerlaw@wyoming.com

*Attorneys for Plaintiffs-Appellants*

**Oral Argument Requested**

# Table of Contents

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

Prior Appeals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Issues Presented for Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

I.     The Standard of Review... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

II.    The District Court Erroneously Required Plaintiffs to Prove a Specific
       or Conscious Intent to Break the Law Requiring Advance Notice of
       Reductions in Retirement Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

III.   After Finding that Plaintiffs "Carried Their Burden" of Showing that
       Solvay Knew the Statute's Requirements and Failed to Provide the
       Required Information, the District Court Erred in Finding "No
       Other Evidence" of an Intentional Failure. . . . . . . . . . . . . . . . . . . . . . . . . 45

IV.    The District Court Erred When It Relied on Character Evidence and
       Unsupported Credibility Determinations to Conclude that Solvay
       Did Not "Intentionally" Fail to Provide Information About How Early
       Retirement Benefits Were Calculated.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

V.     The District Court Erred in Ruling that Solvay Never "Discovered" the
       Failure to Describe How Early Retirement Benefits Were Calculated
       Before and After the Changes.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

i

VI.    The District Court Erred in Ruling that this Circuit Did Not Remand
       for a Determination of Whether Solvay's Summary of Material
       Modifications ("SMM") Failed to Disclose How Early Retirement
       Benefits Are Calculated. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

VII.   In Light of *CIGNA Corp. v. Amara*, the District Court Erred in Ruling
       that "Extraordinary Circumstances" Is a Prerequisite to Equitable
       Relief for Violations of ERISA §§102(a) and 204(h). . . . . . . . . . . . . . . . 62

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

Oral Argument Request . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

Orders and Judgment to Be Reviewed

Relevant Statutes and Regulations

Certificate of Compliance

Certificate of Digital Submission

Certificate of Service

## Table of Authorities

## Cases

*Ackerman v. Warnaco, Inc.*, 55 F.3d 117 (3d Cir. 1995). ........................... 62

*Amara v. CIGNA*, 534 F. Supp. 2d 288 (D.Conn. 2008). ..................... 35, 43

*Amara v. CIGNA*, 559 F. Supp. 2d 192 (D.Conn. 2008). ......................... 35

*Anderson v. Bessemer City*, 470 U.S. 564 (1985). ............................... 34, 53

*Bixler v. Central Pa. Teamsters Health & Welfare Fund*, 12 F.3d 1292
   (3d Cir. 1993). ......................................................................... 58

*Brady v. Dow Chemical Co.*, 311 Fed.Appx. 626 (4th Cir. 2/18/2009)  41, 53

*Brower v. Fred S. Soeprono M.D. Inc. Defined Benefit Plan*, 2011 WL
   3806960, 2011 U.S. Dist. LEXIS 96721 (C.D. Cal. 8/29/2011). ........... 41

*CIGNA Corp. v. Amara*, 131 S. Ct. 1866 (2011). ................... 3, 12, 35, 62-64

*Chevron, U.S.A. v. NRDC*, 467 U.S. 837 (1984). ....................................... 61

*Chiles v. Ceridian Corp.*, 95 F.3d 1505 (10th Cir. 1996). .......................... 63

*Conover v. Aetna US Health Care Inc.*, 320 F.3d 1076 (10th Cir. 2003),
   *cert. denied*, 542 U.S. 936 (2004). .......................................... 33

*Creative Consumer Concepts, Inc. v. Kreisler*, 563 F.3d 1070
   (10th Cir. 2009). ...................................................................... 34

*Douglas S. v. Altius Health Plans, Inc.*, 409 Fed. Appx. 219
   (10th Cir. 2010). ...................................................................... 33

*EEOC v. Wiltel, Inc.*, 81 F.3d 1508 (10th Cir. 1996). .................................. 33

*Eddy v. Colonial Life Insurance Co.*, 919 F.2d 747 (D.C. Cir. 1990). ........ 58

*Flying J. Inc. v. Comdata Network*, 405 F.3d 821 (10th Cir. 2005),
    *cert. denied*, 546 U.S. 1170 (2006). ........................................................ 34

*Frommert v. Conkright*, 433 F.3d 254 (2d Cir. 2006)........................... 40, 61

*Harvey v. United Transportation Union*, 878 F.2d 1235 (10th Cir. 1989),
    *cert. denied*, 493 U.S. 1074 (1990). ........................................................ 34

*Hatahley v. United States*, 351 U.S. 173 (1956). ......................................... 40

*Horn v. Cendant Operations, Inc.*, 69 Fed. Appx. 421 (10th Cir. 2003). .... 58

*Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*,
    130 S. Ct. 1605 (2010). ............................................................................ 36

*Lettrich v. J. C. Penney Co.*, 213 F.3d 765 (3d Cir. 2000). ......................... 63

*M.E.N. Co. v. Control Fluidics, Inc.*, 834 F.2d 869 (10th Cir. 1987). ......... 38

*McNeil v. Abiseid*, 2008 WL 4809095, 2008 U.S. Dist. LEXIS 88702
    (E.D. Ark. 10/30/2008). ........................................................................... 41

*Metz v. Merril Lynch, Pierce, Fenner & Smith*, 39 F.3d 1482
    (10th Cir. 1994). ....................................................................................... 34

*Osborn v. Durant Bank & Trust Co.*, 24 F.3d 1199 (10th Cir. 1994)..... 33-34

*Otero v. Mesa County Valley School District*, 568 F.2d 1312
    (10th Cir. 1977). ................................................................................. 34, 49

*Pickering v. USX Corp.*, 809 F. Supp. 1501 (D.Ut. 1992). .......................... 40

*Production and Maintenance Employees' Local 504 v. Roadmaster Corp.*,
    954 F.2d 1397 (7th Cir. 1992). ................................................................. 40

*Rocky Mountain Helicopters, Inc. v. Bell Helicopters Textron*,
    805 F.2d 907 (10th Cir. 1986). ................................................................. 52

*Romero v. Allstate Corp.*, 404 F.3d 212 (3d Cir. 2005)................................  40

*State Ins. Fund v. Ace Transport*, 195 F.3d 561 (10th Cir. 1999)...........  33-34

*Tomlinson v. El Paso Corp.*, 653 F.3d 1281 (10th Cir. 2011). ....................  63

*United States v. Graham*, 394 Fed. Appx. 479 (10th Cir. 9/7/2010). ..........  60

*United States v. Jackson*, 248 F.3d 1028 (10th Cir. 2001), *cert. denied*,
    534 U.S. 929 (2001)..................................................................................  39

*United States v. Martinez-Morel*, 118 F.3d 710 (10th Cir. 1997)...............  39

*United States v. Martorano*, 767 F.2d 63 (3d Cir. 1985), *cert. denied*,
    474 U.S. 949 (1985)...........................................................................  39, 42

*United States v. Phillips*, 19 F.3d 1565 (11th Cir. 1994), *cert. denied*,
    514 U.S. 1003 (1995)................................................................................  39

*Estate of Whitlock v. Commissioner*, 547 F.2d 506 (10th Cir. 1976),
    *cert. denied*, 430 U.S. 916 (1977)..........................................................  62

## Statutes, Regulations, Legislative History and Rules

ERISA §102(a), 29 U.S.C. §1022(a). ...............................................  3-4, 59-64

ERISA §204(g), 29 U.S.C. §1054(g). ...........................................................  8

ERISA §204(h)(2), 29 U.S.C. §1054(h)(2)...................................................  36

ERISA §204(h)(6)(B), 29 U.S.C. §1054(h)(6)(B)..................  4, 40, 53, 59-60

ERISA §204(h)(9), 29 U.S.C. §1054(h)(9)...................................................  35

ERISA §502, 29 U.S.C. §1132. ...........................................................  60, 62

26 C.F.R. 54.4980F-1.................................................................  18, 36, 60-61

29 C.F.R. 2520.102-2(a). ........................................................................... 36, 59

29 C.F.R. 2520.104b-3(a). .......................................................................... 59

67 F.R. 19713 (April 23, 2002)..................................................................... 61

146 Cong. Rec. H6476-01 (July 19, 2000).................................................... 35

H.R. Conf. Rep. 107-84, 2001 U.S.C.C.A.N. 46. ............................. 35, 40-41

Rev. Rul. 2003-124 , 2003-2 C.B. 1173.......................................................... 6

F.R.E. 404............................................................................................... 51

## Miscellaneous

*Black's Law Dictionary*................................................................... 38

*McCormick on Evidence.* ............................................................... 52

## Prior Appeals

This Circuit decided a prior appeal in C.A. 09-8082 on September 7, 2010, which is officially reported at 625 F.3d 641.

## Statement of Jurisdiction

The District Court had subject matter jurisdiction over this action under 28 U.S.C. §1331 and 29 U.S.C. §1132(e)(1).

Pursuant to this Circuit's opinion and judgment in C.A. 09-8082, the District Court scheduled a trial on the issues of: "(1) Whether Defendants intentionally failed to describe how the early retirement benefits are calculated in the §204(h) notice; (2) Whether the plan administrator discovered an unintentional [failure to] describe how the early-retirement benefits are calculated in the §204(h) notice; (3) Whether Defendants failed to promptly provide the required notice after the discovery of an unintentional failure; and (4) Whether Defendants violated the SMM requirements of ERISA §102(a)." JA 212.  On May 24, 2011, the District Court denied a summary judgment motion by Defendants. JA 146. The District Court conducted a seven-day bench trial in July 2011. On October 1, 2011, the District Court issued findings of fact and conclusions of law in favor of the Defendants on all issues. JA 1-43.

Plaintiffs filed a Notice of Appeal on November 7, 2011. JA 1588. This

1

Court has jurisdiction under 28 U.S.C. §1291, because the appeal is from a final

order of a United States District Court.

## Statement of Issues Presented for Review

1.      Whether the District Court erred in effectively requiring a "specific

intent" to break the law to obtain relief for an "intentional failure" to provide the

information required by ERISA §204(h), 29 U.S.C. §1054(h).

2.      Whether the District Court erred when it ignored Plaintiffs'

circumstantial evidence in finding "no other evidence" that Solvay intentionally

failed to provide information about how early retirement benefits were calculated

before and after the 2005 changes.

3.      Whether the District Court erred in relying on character evidence and

unsupported credibility determinations to conclude that Solvay did not

"intentionally" fail to provide information about how early retirement benefits

were calculated.

4.      Whether the District Court erred in ruling that Solvay never

"discovered" its failure to understandably communicate how early retirement

benefits were calculated, including how early retirement benefits were "protected."

5.      Whether the District Court erred in ruling that this Circuit did not

remand for a determination of whether Solvay's Summary of Material

2

Modifications ("SMM") failed to disclose how early retirement benefits are calculated.

6.    Whether in light of *CIGNA Corp. v. Amara*, 131 S.Ct. 1866 (2011), the District Court erred in ruling that "extraordinary circumstances" is a prerequisite to equitable relief for a violation of ERISA §102(a), 29 U.S.C. §1022(a).

## Statement of the Case

Effective January 1, 2005, Solvay adopted a "cash balance" pension formula to replace its traditional defined benefit formula. As a result of the design Solvay selected, employees experienced reductions in future retirement benefits, including less favorable early retirement benefits.

On November 15, 2006, named Plaintiffs Jensen and Goff filed this lawsuit. The Complaint alleges that the Defendants violated the ADEA and ERISA by converting to the cash balance formula in a way that created "wear-away" periods in which older employees do not earn additional pension benefits, and by failing to disclose the benefit reductions and other disadvantages in an ERISA-required Section 204(h) notice and a Summary of Material Modification ("SMM"). On February 8, 2008, the District Court certified a class action under ERISA and a collective action under the ADEA.

3

On August 3, 2009, the District Court granted Defendants' motion for summary judgment on all claims. Plaintiffs appealed to this Court. In *Jensen v. Solvay*, 625 F.3d 641 (10th Cir. 2010), this Court affirmed the grant of summary judgment on Plaintiffs' ADEA and ERISA claims, except for finding that Solvay's §204(h) notice violated the statute and regulations by failing to describe the calculation of early-retirement benefits. 625 F.3d 641, 654-55. This Court concluded that Solvay's 204(h) notice "contains no ... description" of how the early retirement benefit was calculated under the old plan. 625 F.3d at 654. This Circuit remanded for a determination of whether this was an "egregious failure" within the meaning of ERISA §204(h)(6)(B), 29 U.S.C. §1054(h)(6)(B). The panel also held the failure to disclose how early retirement benefits were calculated may have violated the SMM requirements in ERISA §102(a), 29 U.S.C. 1022(a), leaving that issue for the trial court on remand. *Id*. at 657-58.

On remand, the District Court denied a new defense motion for summary judgment in a decision reported at 788 F.Supp.2d 1278. The District Court rejected Defendants' position that proof of a "deliberate" or "conscious" aim to break the law was required to establish an "intentional failure." JA 140-41. The District Court ruled that intent is "most often" shown by circumstantial evidence and found a genuine issue of material fact because of evidence "tending to show

4

that Solvay knew the specific statutory requirements...coupled with Solvay's failure to follow the requirements." JA 142-43. The Court further ruled that the "discovery" of an "unintentional failure," which triggers an obligation to "promptly" provide the required information, "includes both actual and constructive knowledge" and found a "genuine issue of material fact as to whether the administrators discovered employees were having trouble making the [early retirement] calculations themselves." JA 143-45.

However, following a seven-day bench trial in July 2011, the District Court issued findings of fact and conclusions of law, concluding that Solvay's ERISA §204(h) violation was *not* an "intentional failure" or a case in which Solvay failed to "promptly provide" the information after "discovery" of an unintentional failure. JA 37-38, 40. The District Court further ruled that this Circuit's remand did not include Plaintiffs' SMM claim, and if it was included, that Plaintiffs were not entitled to any equitable relief because they did not prove "extraordinary circumstances." JA 42. Plaintiffs filed a Notice of Appeal on November 7, 2011. JA 1588.

## Statement of Facts

1.    As part of their compensation or terms and conditions of employment, the employees of Solvay Chemicals and other affiliated companies participate in

5

the Solvay America Pension Plan. Solvay serves as both the plan sponsor and administrator of the Solvay America Pension Plan. JA 4-5.

2.    Before January 1, 2005, the Solvay America Pension Plan determined retirement benefits using a final average pay formula. The formula multiplied an employee's years of service by 1.1 % of the employee's highest average five-year compensation (plus a smaller percentage of the portion of compensation exceeding the "Covered Compensation" for individuals of that age, *see* Rev. Rul. 2003-124 , 2003-2 C.B. 1173. *Jensen v. Solvay,* 625 F.3d at 643; JA 1607-8.

3.    Before January 1, 2005, the Solvay Plan contained three different early retirement benefits for which participants might qualify at age 55 or after. JA 376-378, 1602. The first and most easily attained early-retirement benefit covered participants who terminated employment before age 55. At age 55 or later, the participant would be entitled to a benefit equal to the amount payable at the normal retirement age of 65, reduced by 4 percent for each year the retirement preceded age 65. JA 377-78, 1602.

4.    The second early-retirement benefit covered participants who retired at or after age 55. In that case, the participants would be entitled to the benefit payable at the normal retirement age of 65, reduced by 3 percent for each year the retirement preceded age 65. JA 378, 1602.

6

5.    The third early-retirement benefit is referred to as the "Rule of 85." This covered participants who attained age 55, and whose years of service plus age equaled 85 points or more. In that case, the participant was entitled to the accrued age-65 benefit with no reduction at all. JA 378, 1602.

6.    The old plan was changed to the cash-balance formula (the new plan) by the execution of the "Sixth Amendment," effective January 1, 2005, by Solvay's then-CEO, David Birney, on December 28, 2004. JA 1705-15.

7.    The new plan offered individual accounts similar to savings accounts except the accounts are hypothetical. An opening account balance was established based on each employee's accrued benefits under the old plan. Pay credits (which range from 2.5% of pay with less than 40 age and service points to a maximum of 5% of pay with 80 or more age and service points) and interest credits (based on 30-year Treasury bond yields) are assigned to the hypothetical accounts on a quarterly basis. JA 1707-8. The annuity benefit at age 65 is determined by projecting the cash-balance account with interest to age 65 and converting to an annuity by applying the interest rate and mortality table in the plan. JA 378-80.

8.    Under the new plan, early-retirement benefits are "subject to [an] actuarial reduction" from the accrued benefit payable at age 65. JA 378-81; 1705-6, 1710. An actuarial reduction is equivalent to approximately 5.3% for each year

7

by which retirement precedes age 65. JA 380-81. This leaves an early-retirement benefit of only 47% of the age-65 benefit for a retirement at age 55, compared with the 60%, 70% or unreduced early retirement benefits available under the old plan. JA 380-81.

9.      The Sixth Amendment provided that employees who were over age 50 and had more than 10 years of benefit service were offered the opportunity to elect to stay under the old plan (and be "grandfathered"). JA 1705.

10.      For employees who were not grandfathered, the reductions in early-retirement benefits caused by the conversion were significant. For employees who would have been eligible for the "Rule of 85," a $1,000 per month benefit would be reduced to approximately $470 per month. JA 380-81. For employees who reached age 55 but were not eligible for the Rule of 85, early-retirement benefits could drop from $700 per month to $470 per month. JA 412; 625 F.3d at 645.

11.      Even under the new plan, participants were required to have a legally-protected interest in the early-retirement benefit that was accrued under the old plan. This protection is established by ERISA §204(g), 29 U.S.C. §1054(g), and is set forth in Section 10.2(b)(ii) of the Plan document. JA 1660. As a result, if a participant retired under the new plan, the participant was still entitled to the early-retirement benefit accrued under the old plan before the conversion if that benefit

8

was higher than what the participant was entitled to under the new plan. JA 381-82.

12.    The protected benefit includes a right to "grow into" eligibility if the participant was not eligible for early retirement at the time of the conversion. For instance, if a participant was age 50 at the time of the conversion and worked for Solvay until age 55, the participant should be able to "grow into" eligibility for the early retirement benefit with the 3% reduction. JA 382. This is called the "protected minimum" benefit or "protected" benefit. JA 381-82l.

13.    A participant should also be able to grow into the "Rule of 85." If the participant was not age 55 at the time of the conversion, but continued to work for Solvay and turned 55 with 30 years of service, he should be able to receive the full, unreduced age-65 pension benefit that was accrued under the old plan. JA 387-89.

14.    It is undisputed that from mid-2004 on Solvay fully understood the nature of these protected benefits, including the right to grow into early retirement eligibility. JA 823, 1031.

15.    Plaintiff Goff's situation illustrates one way a participant can grow into a protected early retirement benefit. Goff's employment with Solvay terminated in 2005 at age 49, but he is now age 55. Under the old plan, Goff's

protected age-55 benefit was $1,029 per month, which equals his age-65 benefit of

$1,715 multiplied by 60 percent (a 4% per year reduction between ages 55 and

65). JA 382-84, 2426. Plaintiffs' actuarial expert calculated that Goff's protected

benefit under the old plan is superior in value to his benefit under the new plan for

a period of some 11 years after the conversion. JA 2426.

16.    But shortly after Goff's termination, he received a benefit application

from Solvay, indicating he was only entitled to a lump sum or a single life annuity

of $573.47 under the new plan. JA 2316. The application did not advise Goff of

the protected benefit, i.e., that he was entitled to a monthly annuity of $1,029 if he

waited until age 55 to commence benefits. JA 763-66.

17.    Solvay projected that its conversion to the cash balance plan would

reduce its cash contributions in 2005 by $5.3 million, and that the company would

realize approximately $177 million in reduced obligations by 2015. JA 563, 1795,

1925, 3285.

18.    The savings from the conversion were known by Solvay's Board of

Directors, CEO, CFO, General Counsel, division presidents, and Human

Resources managers. JA 561-62, 1795, 2763, 3285.

19.    Before the January 1, 2005 effective date, Solvay also knew that the

cash balance plan would be 40 percent less valuable than the old plan. JA 563-64,

1794, 2698, 2734. Solvay knew that the brunt of these reductions would be borne by employees in their 40's and 50's who were ineligible to be grandfathered. JA 1757. Solvay compiled a "close but no cigar" list identifying participants at least age 47 as most likely to react negatively to the changes. JA 556-57, 1798-1829.

20.    Because the Sixth Amendment to the Plan provided for a significant reduction in the rate of future benefit accrual, and eliminated or significantly reduced early retirement benefits, Solvay recognized that ERISA §204(h) required a notice of the reductions to participants. JA 1325.

21.    Before preparing the 204(h) notice, Solvay inquired about the 204(h) regulations. On July 27, 2004, in response to a request from Solvay's Director of Compensation and Benefits, Scott Allen, for the "specific disclosure requirements," JA 949, 1842, Solvay's actuarial consultant, Towers Perrin, transmitted a copy of the 204(h) regulations, together with a 19-page memorandum. JA 1843-77. Allen read the memorandum and the regulations. JA 838.

22.    Towers' memorandum advised Solvay that its 204(h) notice "must be written in a manner calculated to be understood by the average plan participant," and that the notice "must describe how the early retirement benefit or retirement-type subsidy is calculated from the accrued benefit before the amendment, [and]

11

how the early retirement benefit or retirement-type subsidy is calculated from the

accrued benefit after the amendment." JA 1868.  The memorandum advised that

the regulations "specifically require illustrative examples and not just additional

narrative…for a change that results in a wear-away." JA 1869. A wear-away

period refers to the period of time "it would take [an] employee...simply to catch

up (under the new plan) to where he had already been (under the old plan)."

*CIGNA Corp. v. Amara*, 131 S.Ct. 1866, 1874 (2011).

23.    On July 29, 2004, John Markson, Towers' principal consulting

actuary, advised Solvay of the importance of including "language on the

elimination of the early retirement benefits for future benefit accruals – this is a

big deal with cash balance plans." JA 1878. Markson also illustrated the protected

benefit:

> An employee aged 55, earning $50,000. At the time of conversion,
> the employee has earned a $5,000 annuity at 65, $3,800 if he elects to
> turn it on at 57. The starting cash balance account is equal to the
> present value of the $5,000 annuity and is equal to $31,350. After two
> years, he has a cash balance about equal to $40,000. If he elects an
> immediate annuity, the cash balance at age 57 converts to 3,000, but
> as he is always entitled to at least the $3,800 – that is what he would
> get. The same annuity he had earned two years prior.

24.    Towers also made a PowerPoint presentation in July 2004 advising

Solvay that the 204(h) notice must "inform plan participants of…a reduction in an

early retirement benefit or retirement-type subsidy," and include a "[d]escription of how the early retirement subsidy is calculated both before and after the amendment." JA 1128, 1130-33, 1834.

25.    To market the new cash balance plan positively, Solvay developed a "communications campaign." JA 553, 571-72, 943-44, 1928. To kick off the campaign, Solvay convened its Human Resources managers in Houston, Texas for a "Pension and Benefits Workshop" on September 1, 2004, led by Solvay's Director of Compensation and Benefits. JA 452-53, 1891, 3197. There, Solvay rolled out the elements of the campaign:

> • Written materials (the FutureChoice Brochure, Decision Guide, and 204(h) notice).
> • Personalized Projections/Opening Account Balance Statements.
> • Intranet information and e-mail.
> • Posters.
> • Local on-site meetings.

JA 1928.

26.    The campaign's theme was that the conversion was "value neutral" to participants and "cost neutral" to Solvay. The "philosophy" was "No Fundamental Change." JA 294-95, 462-63, 488, 1922, 1925-26, 2133, 3517.

27.    In a September 8, 2004 presentation for the presidents of Solvay's divisions, Solvay's Vice President for Human Resources, Carolyn Egbert, "did not

13

communicate any concept…that any employees were going to be losing benefits."

JA 652, 3270.

28.     As the plan sponsor and administrator of the Solvay America

Pension Plan, Solvay had a non-delegable duty to provide its employees with a

notice that complied with ERISA §204(h) and applicable regulations. JA 527-28,

873, 1335, 1396. To do that, Solvay acted through Egbert, the Vice President of

Human Resources, and Allen, the Director of Compensation and Benefits, who

were vested with the responsibility and authority over what was communicated to

employees. JA 2042-43, 2045-46, 2173, 2176, 3235-50.

29.     Egbert and Allen concede that Solvay had the capability to comply

with the 204(h) regulation. JA 573-74, 868-71. The record also shows that Egbert

and Allen had the authority to open up or shut down the flow of information to

participants. JA 2173.

30.     Egbert was in charge of policy and responsible for overseeing the

content, completion, and transmission of the 204(h) notice. JA 515-16, 528, 532,

640. While Egbert had the overall responsibility, she testified she never actually

read the 204(h) notice "word for word." JA 528, 532, 640.

31.     Allen, who reported to Egbert, had the lead operational role and "full

ownership" of the 204(h) notice. JA 885, 944. He became the "central

14

communications point" with regard to the notice among Solvay, Towers, and

Pillsbury Winthrop, Solvay's outside counsel. JA 972-73.

32.    On August 25, 2004, Solvay directed Towers Perrin to prepare a first

draft of the 204(h) notice, which was due September 1, 2004. JA 3189.

33.    Through Allen, Solvay controlled the drafting of the 204(h) notice.

JA 972. During the course of drafting, comments and changes were made by

Solvay through Allen, by Towers through Misthos (who replaced Markson as

Towers' consultant to Solvay), and by Pillsbury through its ERISA counsel, Cindy

Schlaefer. JA 1978-84, 2027-33, 2034-41, 2045-53, 2054-60, 2061-69, 2070-77,

2078-86, 2087, 3198-3210, 3211-3223, 3235-50.

34.    Allen, a Certified Employee Benefit Specialist, described himself as a

benefits expert and "benefits geek" and said the cash balance changes had been "a

great opportunity to get in and really do something creative." JA 2186. Emails and

redlined documents show Allen evaluating "suggested changes" or "suggestions"

from Solvay's advisors and advancing "concerns," "edits" and rewrites of his own.

*See, e.g.,* JA 2042, 2046, 2087, 3235-50, 3369, 3371.

35.    Allen exercised his authority to accept or reject "suggestions" from

Misthos and Schlaefer and draft edits of his own, including substantive changes.

JA 886-88, 971, 1038-39, 1078, 1376-77, 1417-18, 3235-50, 3369, 3371.

36.    Schlaefer was asked to provide her comments on the notice over the

Labor Day weekend. JA 515, 1308, 1336, 3226. Schlaefer had previously advised

Solvay it could only "minimize the risk of litigation" by making "full disclosure"

to participants. JA 1320. Schlaefer cautioned Solvay:

> A number of these [cash balance] conversions resulted in certain
> groups of employees accruing less benefits than they would have
> under the traditional plan, or in some cases accruing no benefits at all
> for a period of years. Employees were not always fully informed of
> these consequences at the time of implementation, adding to their
> outrage over the plan conversions.

JA 2168.

37.    Schlaefer was not asked to provide Solvay with advice on what

ERISA §204(h) and the regulations required. Nor did she advise Solvay on the

"calculated to be understood" requirement, the "how to" calculate requirement, or

the duty to "promptly" correct an unintentional failures. JA 1375-76. Instead, she

was asked to provide thoughts or suggestions on what she regarded as "largely an

actuarial document." JA 1333.

38.    In her "thoughts" about the notice, Schlaefer added undefined legal

and actuarial terms, including "early retirement subsidy" and "protected minimum

benefit." JA 2034-41, 1314, 1384-85, 1392-93. Schlaefer understood "early

retirement subsidy" to be a legal term that meant the excess of the actuarial present

value of a retirement benefit over the actuarial present value of the accrued

benefit. JA 1366, 1392. She testified that she was informed that employees would

be able to understand the term "subsidy" in "conversations with the company, with

Scott Allen and with John Markson." JA 1354-56; see also JA 1337. Schlaefer

later testified that "I don't have any evidence that they [the employees] wouldn't"

understand. JA 1367.

39.    Allen recognized that "early retirement subsidy" was benefits

"jargon" JA 862, but rather than write a notice that made the changes

understandable, he edited it in ways that made it more technical. A red-line shows

Allen rewriting the notice to remove a statement about how the old benefits were

protected. JA 3244. At trial, Allen described this revision as "nonlegal and

nonactuarial." JA 869.

40.    Allen changed Schlaefer's suggested insertion of two references to an

"early retirement subsidy" to "subsidies" (in the plural form). JA 1038, 1044,

1049, 3245-46. He testified that those changes were substantive because he

believed there was "more than one type of subsidy," *i.e.*, "the 3 percent, the 4

percent, and the Rule of 85." JA 849, 1038.

41.    Allen overrode Schlaefer's suggestion that the notice should

show the "maximum" wear-away. JA 2038, 2061. Although the 204(h) regulations

17

state that examples should illustrate the "maximum" reductions, 26 C.F.R.

54.4980F-1, Q&A-11(a)(4)(ii)(B), Allen agreed with Towers' Misthos that it was

sufficient to provide an "indicative" example. JA 1159-60, 2054-60, 2061-69,

2078-86.

42.    Solvay knew the notice "had to be in clear, understandable language

that our employee population would understand," JA 691, 1034, 1868, and knew it

was Solvay's responsibility, not Towers' or Pillsbury's, to make sure the 204(h)

notice was understandable to the average participant. JA 1036, 1081.

43.    Solvay never asked for a legal or actuarial opinion from Pillsbury or

Towers on whether its notice was in compliance with the regulation on disclosing

the early retirement reductions, and never obtained such an opinion. Solvay's

outside counsel and actuary testified they did not give Solvay a legal or actuarial

opinion on its 204(h) notice. JA 1233-34, 1370b-1370c, 1419.

44.    Egbert testified that the determination of whether the notice was

understandable to the average participant was a shared responsibility among

herself, Allen, Markson, and Schlaefer. JA 690-91. But neither Solvay, Towers nor

Pillsbury performed any due diligence concerning the understandability of the

terms "early retirement subsidies" or "protected minimum benefit," which Allen

conceded is benefits "jargon." JA 862. Misthos testified that "early retirement

18

subsidy" is a term used by actuaries and clients, although she believed "a lot of people would know the term subsidy." JA 1238. Schlaefer disclaimed any expertise in understandability of communications (JA 1395) and testified that Solvay was in a "better position" to know what its employees understood than she would. JA 1396-97.

45.    The District Court found that "Solvay's intent was to provide a compliant 204(h) notice to participants" "based on the credible testimony of Allen, Egbert, Misthos, Schlaefer, and Maxfield." JA 26. But Allen, Egbert, Misthos, and Schlaefer were each impeached at trial:

a.    Allen denied that if people continued to take annuities that would perpetuate the plan's "volatility," JA 822-23, even though he so testified at his deposition. JA 985b. He was impeached again when he testified he thought most employees knew "subsidized" benefits referred to the 3%, 4%, and Rule of 85 early retirement benefits, JA 844-45, even though at his deposition he admitted that subsidy was benefits "jargon." JA 985c.

b.    Egbert was impeached when she testified that "early retirement subsidies" includes not only the Rule of 85, but also the early retirement benefits with the 3 and 4% adjustments. JA 550-51. At her deposition, she testified the references to "early retirement subsidies" were only to the "Rule of 85." JA 578n-

19

578o.

c.    Misthos was impeached when she testified she thought Solvay's notice complied with the regulations, JA 1233-34, even though her deposition testimony was that it was a "tricky" or "legal" question that Towers was not qualified to answer. JA 1370b-1370c. She was impeached again when she testified that employees know what "early retirement subsidies" are, JA 1238-39, when she testified at her deposition that early retirement subsidies is a term actuaries and their clients use, and she does not know whether employees talk about early retirement subsidies. *Id*.

d.    Schlaefer was impeached when she would not admit subsidy was a "legal term," JA 1392, after she described it as a "legal term" at her deposition. JA 1392. Schlaefer also testified she thought employees would understand "early retirement subsidies" the way it was explained in the notice, JA 1393-94, when she testified at her deposition that "it's hard to say" whether employees would understand. JA 1393-94.

46.    The term "early retirement subsidies" was never used in any Solvay communication before the 204(h) notice. JA 864. Neither Solvay's old plan nor its January 2003 SPD used the terms "early retirement subsidy" or "subsidies." JA 1591-1719, 1720-43. Likewise, neither the Sixth Amendment nor Solvay's

2006 and 2010 SPDs use the terms "early retirement subsidy" or "subsidies." JA 1705-15, 2396-2416, 2427-76.

47.    Solvay's workforce is diverse in educational, social, and economic background. Of nearly 3,800 employees in Solvay's Plan, JA 2381, the District Court heard testimony from eight hourly and salaried employees and four executives. The non-executive employees had high school degrees, and, in some cases, education at community colleges or trade schools. JA 276, 328, 437, 698, 717, 732, 1084. The Court also heard the testimony from four Solvay executives with accounting, law, and business degrees. JA 369, 578c, 511, 1107, 1146d, 1302.

48.    None of the employees who testified understood the terms "early retirement subsidy" or "subsidies" as used in Solvay's 204(h) notice. JA 285-88, 338, 704-5, 721, 750, 846. Not one person knew that a 3% or 4% per year reduction for early retirement was considered "subsidized." JA 323, 341, 466, 550-51, 578g, 578n-578o, 608, 736, 1146h.

49.    Solvay produced no employee witnesses or other evidence that any participant understood the terms "early retirement subsidy" or "subsidies," "protected minimum benefit," or "actuarial equivalent"–all of which are in the 204(h) notice.

50.     Even senior Solvay executives and managers with responsibilities related to the Plan were unsure about the terms:

(A)     Egbert, the Vice President for Human Resources, testified at her deposition that the references to "early retirement subsidies" only referred to the Rule of 85, before trying to change her testimony at trial to encompass the 3% and 4% reductions. JA 550-51, JA 578n-578o, 608.

(B)     Paul Harding, who replaced Egbert in 2005, JA 1107, 1146d, testified by deposition that the only early retirement subsidy under Solvay's Plan is the Rule of 85. JA 1146h.

(C)     Solvay's Chief Financial Officer, Philip Uhrhan, testified by deposition that the meaning of the statement, "The current plan formula includes an early retirement subsidy," was "not clear" to him. JA 369, 578g. Uhrhan was unsure about which early retirement benefits had a subsidy. JA 578f. He finally testified that the Rule of 85 is an early retirement subsidy, but the 3% per year reduction is not. JA 578g.

(D)     James Maxfield, Solvay's Human Resources manager at the Green River, Wyoming plant, had never heard the term "early retirement subsidy" before September 2004. JA 465. Maxfield now believes the term is synonymous with the "Rule of 85." JA 466.

22

51.    The words "subsidy" or "subsidies" do not address the issue of "how" early retirement benefits were calculated from the accrued benefit. 625 F.3d at 654-55. Plaintiffs' actuarial expert and Defendants' actuarial expert both agreed that the use of the term "subsidies" does not provide the information the 204(h) regulations require. JA 389-90, 433-34. Solvay's actuarial consultant, Misthos, agreed that "just saying something is subsidized" is "not quantitative." JA 1178-79, and Solvay's outside counsel also testified that "early retirement subsidy" "doesn't convey any particular quantity." JA 1392-93.

52.    The term "protected minimum benefit," which was introduced by Schlaefer and left in the notice by Allen was never used in any Solvay communication with participants before or after the 204(h) notice. JA 1039. It is not in the Plan document (JA 1591-1719) or the SPDs. JA 2396-2416, 2427-2476.

53.    Solvay's employees were never told in understandable language about how the "protected" benefit feature could preserve the early retirement benefits under the old plan, including the "Rule of 85." JA 323, 341, 708-9, 721, 743, 754, 1089-90, 1102. No one understood that employees were still able to "grow into" early retirement eligibility under the old plan rules. *See, e.g.*, JA 478-79, 756. Named Plaintiff Goff testified that until the first day of trial he thought the "Rule of 85" benefit was completely "lost" and was never advised by Solvay

23

that his old early retirement benefits were "protected" and that he was eligible for
an early retirement benefit of $1,029 if he retired at age 55. Instead, Solvay sent
Goff a benefit commencement package indicating that he was only entitled to a
monthly benefit of $573.47. JA 756, 765-66. Maxfield only learned about
"protected" benefits several months before trial, over six years after the changes.
JA 478.

54.    As Solvay's Director of Compensation and Benefits, Allen testified
that preserving the protected benefits would have perpetuated the "volatility" of
the pension plan, which was at odds with Solvay's objectives. JA 822-23, 985b.
Allen also testified he was aware that "98 or 99% of the people" would elect lump
sum distributions of their cash accounts, unaware of the potentially greater value
of their protected early retirement benefits from the old plan. JA 913, 2209.

55.    Solvay's PowerPoint presentation and speaker's notes for the
September-October employee meetings and the recorded oral presentations at two
of those meetings failed to explain to employees how the "old plan" early
retirement benefits were "protected" under the new plan. While the PowerPoint
presentation includes a statement that the "Rule of 85/early retirement features
remain in the [old] pension plan," that statement was only on a slide explaining
grandfathering. JA 2134. Nowhere did the PowerPoint explain how early-

retirement benefits were protected under the new plan. Solvay maintained this

silence, even as employees complained about losing the "Rule of 85" so loudly

that Allen suffered an "anxiety" attack on the first day of employee meetings in

Green River. JA 485, 1005-6. Allen professed that he explained this to employees,

but could not cite a single instance when he or anyone else at Solvay did. JA 817-

18, 828-29.

56.    Personalized Opening Account Balance Statements issued in

September 2004 and quarterly account statements issued thereafter did not

disclose the "protected" early retirement benefits. JA 2535-37, 2538-41, 2542-45,

2546-49.

57.    Benefit election packages like the one mailed to Don Goff did not

inform participants about their protected early retirement benefits. JA 387-88, 763-

66.

58.    The SPDs that Solvay distributed in 2006 and 2010 likewise failed to

disclose the protected early retirement benefits. JA 2396-2416, 2427-2476, 877-

78.

59.    For distribution to employees, the 204(h) notice was packaged with

two communications: the "FutureChoice" brochure (JA 2094-2124) and the

Personalized Statement of Estimated Opening Account Balance. *See, e.g.*, JA

25

2532-2534, 2535-2537, 1002. The Personalized Statement and the 204(h) notice were in a pocket at the back of the FutureChoice brochure. JA 2094-2124, 701-2, 744-45.

60.     Solvay mailed the 204(h) notice to active employees the week following September 17, 2004. JA 1928. Solvay's 204(h) notice states that the FutureChoice brochure and the 204(h) notice together constitute the "summary of material modifications" that Solvay is required to distribute under ERISA §102(b). JA 2088.

61.     The FutureChoice brochure is a glossy 31-page brochure with photos of older people enjoying an array of activities, such as skydiving and hoola-hooping. JA 2094-2124. The FutureChoice brochure contains no information about early retirement benefits under the old plan or the new plan. JA 2094-2124, 281, 432-33, 695, 743-44.

62.     As a part of the communications roll out, Solvay conducted in-person meetings with employees at its North American locations during September and October 2004 to "ensure that [employees] fully understood the program." JA 852, 3418-32, 3484, 846, 1004.

63.     Allen, Egbert and Tara Johnson, who assisted Allen, developed a PowerPoint presentation and speaker's notes for these meetings. JA 847, 2125-53.

26

The PowerPoint told participants, "FutureChoice is cost neutral to the Company and is value neutral to employees as compared to the current retirement plans." JA 2133, 294-95, 757. Participants were also told there was, "No Fundamental Change," JA 2145, with a positive summary of the changes at the end of the presentation. JA 2146, 760. Videotapes of meetings conducted by Allen and Johnson also offer the same message of neutral or better benefits with no losses. JA 2183-2230, 2231-2259. There was no explanation of how the old plan's early retirement benefits were "subsidized" or how those benefits are "protected" in the PowerPoint presentation or speaker's notes. JA 2125-2153, 852-53, 856.

64.    Allen's videotaped presentation shows he actually told employees that the early retirement benefits were better without the 3% reduction, telling them that under cash balance:

> There are no reductions for early retirement, whatever your balance is, it is what it is...A lot of people are still thinking oh wait that 3% per year early retirement still applies, no it doesn't. Whatever you have at that time is yours.

JA 2217; *see also id*. at JA 2210-11.

65.    From the presentations, employees were given positive impressions about the conversion, and some did not gather their benefits were being reduced. JA 294, 340-41, 722-23, 760.

66.    Employees did not receive comparative information at the meetings from which they could compare differences between the old plan and the new plan. JA 299, 335, 342. In the Green River meeting, employees became "hostile" when they "couldn't get a straight answer." JA 713-14.

67.    While the $177 million in projected 10-year savings by Solvay was not disclosed to employees, it was communicated to Human Resources managers, including Maxfield, Solvay's HR manager at Green River, during the September 2004 meeting. JA 466-68, 1925. Solvay further disclosed that the conversion was "[n]ot completely cost neutral…actually will likely be a savings…" JA 1925.

68.    As a result of these disclosures, Maxfield concluded that the conversion was not value neutral to the employees or cost neutral to Solvay. JA 468-69. Maxfield also concluded that Solvay intended to present inaccurate information to the Green River employees.

69.    Maxfield confronted Allen and asked him to change the slides to reflect the "unpleasant message" but Allen refused. JA 481-82, 487-89. After handling introductions, Maxfield "chose not to participate in giving the presentation." JA 483-84. He testified, "I felt strongly that the message wasn't being articulated in a way that was accurate to the impact that it was gonna have on individual employees." JA 486.

28

70.    Participants were confused about the information they received
at the meetings. They asked Solvay's HR representatives questions, seeking
comparative information between benefits under the old plan and the new plan. JA
299, 342-46, 439-40, 443, 723, 761. In Solvay's words, the distribution of the
written communications and the oral presentations in September-October were met
with a "barrage of questions" "growing in intensity" from employees "many ... in
their 40's." JA 2173-75, 2182, 2264.

71.    Solvay did not keep records of the questions (JA 1065-66), but many
employees asked for side-by-side comparisons of benefits before age 65. For
instance, Debra Godwin requested estimates of her old and new benefits at age 59-
1/2. JA 2288-89. Allen's assistant told her HR representative that: "Since the
employee's eligibility under the traditional plan formula ends 12/31/2004, we
cannot provide projections under this plan past this date since the employee was
not eligible for the traditional plan formula as of 1/1/2005." JA 2290-92; *see also*
JA 2265-66 (requesting "true side by side comparison of the old vs. new plan");
JA 2280-8 (request for age 55 benefit amounts "because [employee] is considering
working somewhere else and wants that information to help make his decision").

72.    Solvay found the questions from the employees near early retirement
so predictable it prepared a list of employees "47 to 49 years old with at least 14

29

years of service" who "have or may be calling us with more questions." JA 2182.

In conducting a review of cash balance in August-September of 2005, Solvay

recognized the "discontent" focused on the loss of "early retirement benefits or

rule-of-85 benefits."  JA 2297-99, 2300-13.

73.    Solvay, through Egbert and Allen, decided that it did not want to

provide participants with "the kind of information they are asking for because it

invites them to do comparisons" between benefits under the old plan and the new

plan. JA 2176. Solvay was "afraid [that comparisons] will only fuel the issue

more." JA 2173. Egbert testified that information about benefits under the old plan

was "fictional information" because participants were no longer eligible for the

old plan. JA 536-38. She testified, "I characterize it as fictional number or

fictitious, meaning that these were numbers that would have no real meaning to

them since they weren't in the old plan." JA 585; *see also* JA 663. Egbert stated

that comparisons of early retirement benefits under the old and new plans were not

relevant and would be "unfair," "downright cruel" and "confus[ing]" to the

employees because "we didn't have the early retirement components in the new

plan." JA 538, 542-43.

74.    Egbert's testimony on *when* she and Allen agreed on the policy of

refusing to provide comparative information was contradictory. She initially

30

testified it was in July-August of 2004–*before* the 204(h) notice was distributed. JA 539-40. The next day, she testified it was in late September or October of 2004. JA 661-62. In either case, she agreed with Allen to refuse to provide employees with comparative information at a time when Solvay could still have promptly provided employees with a legally-compliant notice of a significant reduction in future accruals effective January 1, 2005.

## Summary of Argument

This Circuit's 2010 decision found that Solvay violated the ERISA §204(h) notice requirements by failing to tell its employees "how" early retirement benefits were calculated before and after the plan changes. 625 F.3d at 654. Solvay's notice said "[t]he current plan formula includes an early retirement subsidy," but this Circuit "fail[ed] to see how an employee could calculate early-retirement benefits with just this information." *Id.* at 655. "All that Solvay [could] say in its defense on appeal is to emphasize" that it disclosed that the "current plan formula includes an early retirement subsidy." *Id*. at 654-55. This Circuit also said "the notice does not fully disclose how early-retirement benefits are calculated under the new plan insofar as the new plan incorporates some benefits under the old plan." *Id*.

After a seven-day bench trial on remand, the District Court recognized that Plaintiffs "would have carried their burden" if "intentional failure" is established

31

with "general intent." But the District Court effectively required a "specific intention" to break the law, and said Plaintiffs "pointed to no other evidence" of an intentional failure. (JA 37-38). The District Court gave no weight to "countless pieces" of evidence that Solvay deliberately used impenetrable jargon about "subsidies" in its notice without ever describing "how" early-retirement benefits were calculated before the changes or how those benefits were protected under the new plan, dismissing that evidence as "not relevant." (*Id*. at 23). The District Court also did not attach any probative weight to Solvay's pattern of failing to disclose the early-retirement benefit changes in written and oral communications, including Solvay's Summary of Material Modification/"FutureChoice" brochure, a PowerPoint presentation used for employee meetings, Personalized Statements of Opening Account Balances, quarterly account statements, Solvay's 2006 and 2010 Summary Plan Descriptions, and benefit election materials. Solvay's Director of Compensation and Benefits conceded that Solvay had a financial interest in not disclosing how the old early retirement benefits were "protected" and that he knew that 98 or 99% of the employees were electing lump sums unaware of the greater value of the protected benefits. He further admitted that he and the Vice President for Human Resources decided to adopt a policy of not providing information that might "invite [employees] to do comparisons" because such comparisons were

32

"fictitious" and would only make the employees more dissatisfied. This was all set

out in Plaintiffs' Proposed Findings with citations to the testimony and supporting

exhibits. JA 1459-81. But the District Court improperly disregarded all that

evidence. The District Court also improperly refused to decide whether Solvay

violated ERISA §102(a)'s disclosure requirements by alternatively contending the

violation was not covered by the remand or that "extraordinary circumstances"

were required.

## Argument

### I.    The Standard of Review.

A district court's conclusions of law are reviewed de novo–whether the

conclusions are reached on a dispositive motion or after trial. *See, e.g.*, *Douglas S.*

*v. Altius Health Plans, Inc*., 409 Fed.Appx. 219, 223 (10th Cir. 2010); *Conover v.*

*Aetna US Health Care Inc*., 320 F.3d 1076, 1077 (10th Cir. 2003).

A district court's factual findings are reviewed for "clear error." *State Ins.*

*Fund v. Ace Transp*., 195 F.3d 561, 564 (10th Cir. 1999); *EEOC v. Wiltel, Inc*., 81

F.3d 1508, 1513 (10th Cir. 1996). However, "when a lower court's factual findings

are premised on improper legal standards or on proper ones improperly applied,

they are not entitled to the protection of the clearly erroneous standard, but are

subject to de novo review." *Osborn v. Durant Bank & Trust Co.*, 24 F.3d 1199,

1203 (10th Cir. 1994). In addition, "[w]hether the district court failed to consider

or accord proper weight or significance to relevant evidence are questions of law

we review de novo." *Harvey v. United Transportation Union*, 878 F.2d 1235,

1244-45 (10th Cir. 1989); *see also Otero v. Mesa County Valley School Dist.*, 568

F.2d 1312, 1316 (10th Cir. 1977); *Flying J. Inc. v. Comdata Network*, 405 F.3d

821, 835(10th Cir. 2005); *Metz v. Merril Lynch, Pierce, Fenner & Smith*, 39 F.3d

1482, 1494 (10th Cir. 1994).

A finding of fact is, of course, also "clearly erroneous" if "it is without

factual support in the record, or if the appellate court, after reviewing all the

evidence, is left with the definite and firm conviction that a mistake has been

made." *State Ins. Fund*, 195 F.3d at 564. The trial court's "decision to admit

evidence, including witness testimony," is reviewed under an "abuse of discretion"

standard. *Creative Consumer Concepts, Inc. v. Kreisler*, 563 F.3d 1070, 1079 (10th

Cir. 2009). "This is not to suggest that the trial judge may insulate his findings

from review by denominating them credibility determinations." "Documents or

objective evidence may contradict the witness' story; or the story itself may be so

internally inconsistent or implausible on its face that a reasonable factfinder would

not credit it." *Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985).

II.    **The District Court Erroneously Required Plaintiffs to Prove a Specific or Conscious Intent to Break the Law Requiring Advance Notice of Reductions in Retirement Benefits.**

The policy behind the ERISA §204(h) notice is to provide employees with advance warning of reductions in their future retirement benefits. *Amara v. CIGNA*, 534 F.Supp.2d 288, 337 (D.Conn. 2008). The notice is required to be in plain English so employees will understand the changes and be able to "contest or react." *CIGNA Corp. v. Amara*, 131 S.Ct. 1866, 1885 (2011) (Scalia, J., concurring). This gives employees "leverage" to informally or formally bargain about the changes. *Amara*, 559 F.Supp.2d 192, 210 (D. Conn. 2008).

ERISA §204(h) was enacted in 1986.  In response to complaints employees were still not being told of reductions in early retirement benefits, 146 Cong. Rec. H6476-01, 6522 (July 19, 2000), Congress amended the rule in 2001 to "expand[] the current ERISA notice requirement regarding significant reductions in normal retirement benefit accrual rates to early retirement benefits and retirement-type subsidies."  H.R. Conf. Rep. 107-84, 224, 2001 U.S.C.C.A.N.  46, 195. As amended, ERISA §204(h)(9) provides that "a plan amendment which eliminates or reduces any early retirement benefit or retirement-type subsidy (within the meaning of [ERISA §204](g)(2)(A)) shall be treated as having the effect of reducing the rate of future benefit accrual." The Treasury regulations provide:

35

> [T]he [204(h)] notice must describe how the early retirement benefit
> ... is calculated from the accrued benefit before the amendment [and]
> how the early retirement benefit is calculated from the accrued benefit
> after the amendment.

Treas. Reg. 54.4980F-1, A-11(a)(3)(ii). The regulations also mandate that the

notice "include sufficient information for each applicable individual to determine

the approximate magnitude of the reduction for that individual." *Id*. at A-11(a)(4).

ERISA §204(h)(2) requires that the notice "be written in a manner

calculated to be understood by the average plan participant and shall provide

sufficient information (as determined in accordance with regulations prescribed by

the Secretary of the Treasury) to allow applicable individuals to understand the

effect of the plan amendment." *Accord*, Treas. Reg. 54.4980F-1, Q&A 11(a)(2).

To make a notice understandable, "technical jargon" should "usually" be

eliminated. 29 C.F.R. 2520.102-2(a).

Even if ignorance of the regulations were an excuse, which it is not, *Jerman

v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 130 S.Ct. 1605, 1623 (2010),

Solvay could not claim it. Solvay's actuaries provided a 19-page summary and a

PowerPoint presentation, as well as the regulations, all of which described the

requirement that the notice explain how early retirement benefits are calculated

36

before and after the amendment. Facts ¶¶21-22.[1] Solvay's principal consultant also pointedly warned Solvay about the "importance of including language on the elimination of the early retirement benefits for future benefit accruals – this is a big deal with cash balance plans." Facts ¶23.

On the prior appeal, this Circuit found that Solvay violated the notice requirement, finding that Solvay's "notice contains no such description" on early retirement benefits. 625 F.3d at 654-55. At oral argument, Judge Hartz answered his own question, "Could an employee look at this notice and determine how my early retirement would be computed under the old plan because I don't think so?" "[T]he regulation says it is supposed to describe how it is calculated under the old plan...and that's just not done here." JA 2502-3.

On remand, Solvay filed a motion for summary judgment arguing that "[f]or Plaintiffs to prove an intentional failure" to comply with ERISA §204(h), "they would need to establish that Defendants deliberately omitted information from the 204(h) and made the conscious decision to distribute a deficient 204(h) Notice." JA 140. The District Court denied that motion, ruling that an intentional failure does *not* require proof of "hostile or malicious intent." JA 141. The Plaintiffs

---

[1] Facts ¶__ refers to the numbered paragraphs in the Statement of Facts provided above.

stated that "An intentional violation is one in which the plan sponsor knows what the statute requires and does not provide that information" and the District Court "agree[d]" that "the meaning of intentional does not require maliciousness." JA 140-41. The District Court found there were "several pieces of evidence tending to show that Solvay knew the specific statutory requirements, by way of a PowerPoint briefing, a detailed memorandum, and a copy of the regulations," and "[t]his knowledge coupled with Solvay's failure to follow the requirements creates a genuine issue concerning Solvay's intent." JA 143. The District Court cited cases showing that the term "intentional failure" does not require a showing of "wrongful intent" but is distinguished from "involuntary noncompliance" or noncompliance that is a mistake or the product of mere inattention. *See, e.g., M.E.N. Co. v. Control Fluidics, Inc.,* 834 F.2d 869, 872-73 (10th Cir. 1987).

After trial, the District Court again concluded that "While the term [intentional failure] is undefined, this Court holds that proof of an intentional failure does not require proof of hostile or malicious intent." JA 35. The Court found that "the Tenth Circuit has on numerous occasions explained [that] ... [n]o wrongful intent need be shown." JA 36. The District Court found "the Tenth Circuit definition to be in accordance with the plain meaning of the term. *Black's Law Dictionary* defines 'intentional' as being 'done with the aim of carrying out

the act.'" *Id*.  Following Circuit precedent, the District Court also held, that "[i]n

civil and criminal cases alike, intent can be (and most often is) proved by

circumstantial, rather than direct, evidence." *Id*.

The same principles are established in many other cases, both in the Tenth

Circuit and in ERISA cases outside of it. *See United States v. Martinez-Morel*, 118

F.3d 710, 713 (10th Cir. 1997) (alien's "belief" that he had not been deported

before was "not relevant" because 8 U.S.C. §1326(a) "only" requires "general

intent to do the prohibited act"); *United States v. Jackson*, 248 F.3d 1028, 1030-31

(10th Cir. 2001) ("There is no language in [18 U.S.C.] §1201(a)(5) to require that a

defendant know that the conduct in which he engaged was illegal, which would

require proof of specific intent"); *United States v. Martorano*, 767 F.2d 63, 66 (3d

Cir. 1985) ("general intent (a failure to disclose) rather than a specific intent (a

failure to disclose knowing that such failure violates a statutory disclosure

requirement) is all that is required to prove a violation of [18 U.S.C.] §1027");

*United States v. Phillips*, 19 F.3d 1565, 1576-77, 1584 (11th Cir. 1994), *cert.*

*denied*, 514 U.S. 1003 (1995) ("willfulness" under ERISA §501, 29 U.S.C. §1131,

is "general intent offense" which "ensures that the act was done voluntarily and

not by accident or mistake"; "defendant need not intend to violate the law to

commit a general intent crime, but he must actually intend to do the act that the

law proscribe").

Here, the term "intentional failure" is part of a remedial disclosure requirement in which "unintentional" is the counterpart to "intentional." In a parenthetical to "intentional failure," the statute addresses an "unintentional failure," *see* ERISA §204(h)(6)(B)(i), thereby indicating Congress intended that a failure to provide the notice would be intentional or unintentional. The statutory text, moreover, relates the term "intentional failure" to "the required notice or information," and not to a specific intent to break the law. If an intentional failure required proof of "specific intent" to break the law, a third category of "intentional failure without specific intent" would be created.

If any ambiguity remains, the statutory policies should control. *See, e.g., Hatahley v. United States*, 351 U.S. 173, 179 (1956). Here, the version of ERISA §204(h) in effect before 2001 did *not* condition relief on an intentional failure. *See Frommert v. Conkright*, 433 F.3d 254, 268 (2d Cir. 2006); *Production and Maintenance Employees' Local 504 v. Roadmaster Corp.*, 954 F.2d 1397, 1404 (7th Cir. 1992); *Pickering v. USX Corp.*, 809 F.Supp. 1501, 1564-65 (D.Ut. 1992). The legislative history indicates the 2001 changes were to clarify the notice requirement and expand the protections to reductions in early retirement benefits. *Romero v. Allstate Corp.*, 404 F.3d 212, 219 n.4 (3d Cir. 2005); H.R. Conf. Rep.

40

107-84, at 224, 2001 U.S.C.C.A.N. 46, 195. It would undercut those policies if an "intentional failure" was interpreted to require specific intent, because the statute would then move forward in its coverage, but backwards in terms of relief.

None of the caselaw on ERISA §204(h) requires specific intent. *Brady v. Dow Chemical Co.*, 311 Fed.Appx. 626 (4th Cir. 2/18/2009), held that Dow "committed an egregious violation of the 204(h) notice requirements" by "fail[ing] to promptly rectify its deficient notice after being put on notice of it." *Id*. at 633-34. Dow "knew that multiple plan participants were confused" about the amendment based on "several inquiries" from employees, but did not "rectify the deficient notice." *Id*. at 633. *McNeil v. Abiseid*, 2008 WL 4809095, *7 (E.D. Ark. 10/30/2008), held that an amendment reducing a benefit formula from 21.5% to 15.7% of average compensation was ineffective because "the notice was not adequate." "The burden is on the plan administrator to show that the required Section 204(h) notices were provided to employees." *Id*. *Accord, Brower v. Fred S. Soeprono M.D. Inc. Defined Benefit Plan*, 2011 U.S. Dist. LEXIS 96721, *11 (C.D. Cal. 8/29/2011) (denying summary judgment where employer, "as both the plan sponsor and administrator, had the ability to notify Plaintiff of the amendment" but "failed to show that Plaintiff received such notice, or that such failure to notify was unintentional").

41

Notwithstanding its own decisions and these authorities, the District Court dismissively referred to Plaintiffs' "argu[ment] that all they need to prove for an intentional failure is: (1) knowledge of [the] statute's requirement, and (2) failure to satisfy that requirement." JA 37. The Court recognized that "if intentional failure only required proof of those two elements, Employees would have carried their burden....However, this Court holds as a matter of law that while those two facts are probative of an intentional failure, they are not determinative." *Id*.

Plaintiffs-Appellants do not dispute that this is a reasonably accurate description of "general intent." *See, e.g., Martorano*, *supra*, 767 F.2d at 66 (describing "general intent" as "failure to disclose" as opposed to "failure to disclose knowing that such failure violates a statutory disclosure requirement"). The District Court's indirect criticism seems to be that a "general intent" standard is insufficiently limited. That criticism overlooks not only the precedents cited above, but the limiting principles built into the statute, which contrasts an intentional failure with an unintentional failure, i.e., an oversight or mistake, and requires the failure to be "within the control of the plan sponsor", thus ruling out both accidental and "involuntary noncompliance." The general intent standard also requires "knowledge of [the] statute's requirement." While this cannot be established in every case, it was clearly established here, including by the

42

communication from Solvay's actuarial consultant that "language on the elimination of the early retirement benefits for future benefit accruals" "is a big deal." Facts ¶23.

The case law thus provides limiting principles that can be applied without resorting to "specific intent," for example, by requiring that the noncompliance not be involuntary, a mistake or the product of mere attention. Here, Plaintiffs proved that this was none of those by showing Solvay left this information out not only of the 204(h) notice, but also its SMM/"FutureChoice" brochure, Personalized Statements of Opening Account Balances, quarterly account statements, the 2006 and 2010 SPDs, and benefit election materials. *See Amara*, *supra*, 534 F.Supp.2d at 340 ("Even looking outside the purported §204(h) notice to the other publications provided by CIGNA, information regarding possible reductions in the rate of future benefit accrual is equally non-existent").

The evidence also shows that Solvay intentionally used actuarial and legal terms in the 204(h) notice like "early retirement subsidies," "protected minimum benefit", and "actuarial equivalent" that were not even understandable to Solvay executives, including the CFO and the current and former Vice-Presidents for Human Resources. Facts ¶¶48-58.

Finally, the evidence at trial showed that Solvay, acting through its Vice

President for Human Resources and Director of Compensation and Benefits,

adopted an express policy of refusing to provide "the kind of information" that

"invites [employees] to do comparisons."  Facts ¶73. Even at trial, the HR Vice

President derided comparative information as "fictional" or "fictitious"

information that only makes employees more dissatisfied. *Id*. The Director of

Compensation and Benefits also admitted that Solvay had a financial interest in

not disclosing the extent to which the old early retirement benefits were

"protected" because preserving the protected early retirement benefits would

increase the "volatility" of the pension plan, which he conceded was at cross

purposes with Solvay's objectives. Facts ¶¶45, 54.

      In contrast, the District Court never articulated what more is needed besides

those two probative facts to be "determinative," e.g., whether it is a third element,

or something the District Court will know when it sees. The District Court

indirectly suggests that the standard for "intentional failure" should be somewhere

beyond "general intent" but short of "hostile or malicious," without defining that

standard, except to imply through the circumstantial evidence the District Court

disregarded as "not relevant" and the evidence, including character evidence, on

which it relies that the District Court is searching for "specific intent" to break the

law.

As Plaintiffs describe further below, the District Court's dismissal of the Plaintiffs' circumstantial evidence and its elevation of character evidence to a determinative status effectively adopts the "specific intent" standard the Court rejected on summary judgment. Under the standard the District Court adopted, Plaintiffs would need to prove Solvay executives had a conscious, specific intent to break the law to obtain the civil relief that §204(h) prescribes. Congress did not intend this when it contrasted an "intentional failure" with an "unintentional failure." As shown by the character evidence and conclusory determinations of credibility on which it relied, the District Court improperly converted the standard of "intentional failure" to provide required information into a specific or conscious intent to break the law. This improperly denied Plaintiffs the relief that Congress provided for the violations of 204(h) this Court already found in 2010.

**III.  After Finding that Plaintiffs "Carried Their Burden" of Showing that Solvay Knew the Statute's Requirements and Failed to Provide the Required Information, the District Court Erred in Finding "No Other Evidence" of an Intentional Failure.**

The District Court correctly found that the "Employees would have carried their burden," if the "two elements" necessary to prove an intentional failure were "(1) knowledge of [the] statute's requirement, and (2) a failure to satisfy that requirement." JA 37. It was clearly erroneous for the District Court then to find

45

that Plaintiffs presented "no other [direct or circumstantial] evidence" that Solvay intentionally failed to provide the required early retirement benefit information. The District Court stated that Plaintiffs' evidence, while "enough for th[e] Court to find a genuine issue of material fact for trial," "was not enough to carry [Plaintiffs'] burden at trial" because Plaintiffs "pointed to no other evidence that Solvay intentionally failed to provide the calculations of early-retirement benefits." JA 37-38. In so ruling, the District Court failed to give any probative weight to the circumstantial evidence of intent that Plaintiffs presented at trial and set forth in their Proposed Findings. Instead, the District Court summarily disregarded Plaintiffs' Proposed Findings as consisting of "no other evidence" or being "not relevant." JA 23 n.1.

Besides its improper dismissal of Plaintiffs' evidence, the District Court offered only inadequate support for its conclusion. The District Court asserted that Solvay "did its best to comply with the regulations" because "Solvay consulted multiple experts" who said "their goal (and Solvay's goal) was to comply with the law." JA 38. The District Court cited no expert opinion from either of Solvay's two advisors and no other circumstantial evidence about how Solvay "did its best to comply with the regulation[]." The District Court also cited no evidence of how Solvay or its advisors could reasonably believe that its notice, as finalized,

conformed with the regulation on disclosing how early-retirement benefits were calculated. Solvay never explained how it could know the requirements of the regulations, and yet believe the explanation of early retirement benefits in the notice was compliant. Nor did Solvay explain how the same information about early retirement benefits, including how those benefits were "protected," was consistently omitted from its SMM and SPDs, PowerPoint presentations, opening and quarterly account statements, responses to employee questions, and benefit election materials in the absence of intent.

Besides one piece of character evidence, which is discussed below, and self-serving testimony from the Vice President for Human Resources that she did not intend to break the law,[2] the only evidence the District Court pointed to was testimony by an outside lawyer and an actuarial advisor (not the principal who warned it was "a big deal" to disclose the early retirement changes) that Solvay's "goal" was to comply with the law, even though neither advisor was asked if Solvay's notice on early retirement benefits complied with the requirements.

Plaintiffs showed by contrast, as this Circuit already found, that Solvay's

---

[2] Egbert testified "it's inconceivable to me that anyone could think that we would conspire to withhold information, especially, Your Honor, information that I believed and many of us believe was so well known throughout the group." JA 646-47; *id*. at 572 ("I believed...in all good faith and in my heart that we gave the right information. I did not decide to withhold anything").

47

notice offered no information to employees about "how" early retirement benefits were calculated before and after the changes. Facts ¶¶39, 51-52; 625 F.3d at 654-55. Plaintiffs also showed that Solvay was on notice of the regulatory requirements, including the warning from Solvay's principal actuarial consultant (who Solvay did not call as a witness) that "this is a big deal." Facts ¶¶21-24. Plaintiffs further showed that the terms "early retirement subsidies" and "protected minimum benefit" in the notice were not calculated to be understood because they were not even understandable to Solvay's CFO and two current and former Human Resources Vice Presidents. Facts ¶¶48-58. Plaintiffs also showed that the omitted information was not just omitted from the 204(h) notice but also was not in the "FutureChoice" brochure, the PowerPoint presentation to employees, the 2006 or 2010, the opening and quarterly annual statements, or benefit election materials. Facts ¶¶55-58, 61. Plaintiffs further proved that Solvay had a substantial financial interest in not disclosing how benefits were "protected and that it adopted an express policy of not providing comparative information to its employees, on the ground that such comparisons were "fictional" and would only make the employees more dissatisfied. Facts ¶¶54, 73.

When the District Court stated that Plaintiffs "pointed to no other evidence," it thus arbitrarily failed to cover Paragraphs 22-36 and 44-105 of

Plaintiffs' Proposed Findings (JA 1451-57, 1459-81). *See, e.g., Otero*, *supra*, 568 F.2d at 1316 (district court's findings insufficient where "they d[id] not cover all of the material issues raised by the discrimination charge").

The District Court's decision about the evidence that was "not relevant" was also inconsistent with the contested issues of fact the Court identified in the Final Pretrial Order, including whether Solvay intentionally failed to provide the information on "how the early retirement benefits are calculated in the §204(h) notice." JA 212. The Court's statement that Plaintiffs "failed to satisfy [their] burden of proof," JA 37-38, simply cannot be reconciled with the contested issues of fact set forth in the Final Pretrial Order. Plaintiffs demonstrated that each of the contested issues set out in the Final Pretrial should be resolved in their favor.

**IV.    The District Court Erred When It Relied on Character Evidence and Unsupported Credibility Determinations to Conclude that Solvay Did Not "Intentionally" Fail to Provide Information About How Early Retirement Benefits Were Calculated.**

The District Court improperly admitted character evidence over Plaintiffs' objection and relied on it as a cornerstone that Solvay "did not intentionally fail to disclose how to calculate early-retirement benefits." JA 38. Plaintiffs called Jim Maxfield, Solvay's Human Resources manager at its Green River, Wyoming plant. Maxfield is still employed and testified at considerable risk given that the Vice

President for Human Resources told him there would be "hell to pay" if he continued to express dissatisfaction with the pension changes. JA 497. As a result of the September 2004 meeting in which Solvay's Human Resources managers were told the cash balance conversion would produce $177 million in projected 10-year savings, Maxfield concluded the changes were not "value neutral" to the employees. Facts ¶¶67-68. When the Director of Compensation and Benefits came to Green River to make the employee presentation, Maxfield confronted him and "asked him to change the slides" to reflect "the unpleasant message." The Director refused and, as a result, Maxfield "chose not to participate in giving the presentation." *Id*. ¶69. He testified, "I felt strongly that the message wasn't being articulated in a way that was accurate." *Id*.

Maxfield also testified that he went to Solvay's Houston headquarters and to see if we could "come up with a different formula that was more favorable to what employees were concerned about." JA 495-96. After that visit, Egbert, the Vice President for Human Resources, told Maxfield "that [Solvay's] CEO said to get on the track and [be] supportive of this pension change or there would be hell to pay." JA 497.

At the end of Maxfield's cross-examination, Solvay's counsel asked him about working with Allen, Egbert, and Harding, the current Vice President for

50

Human Resources, and then asked, "Is it your opinion that any of those individuals would intentionally fail to comply with the law in doing this conversion?" JA 506. The District Court overruled Plaintiffs' objection and directed Maxfield to answer. JA 507. He stated, "It is my opinion that none of those people would intentionally do anything to not comply with the law." *Id*.

The District Court relied on this inadmissible character evidence, without reconciling it with Maxfield's testimony about Egbert's and Allen's factual conduct, concluding that "one class member who had a working relationship with those employees making the ERISA decisions stated that none of those employees 'would intentionally do anything to not comply with the law'." JA 38. The District Court also erroneously held that "[b]ecause Maxfield was an adverse witness to Solvay as his future pension benefits were reduced as a result of the conversion, the Court finds Maxfield's testimony credible." JA 25. As a current managerial employee whose job was at risk, Maxfield was not an adverse witness to Solvay. Other witnesses, including Allen, Uhrhan, and Harding, had their future benefits reduced, and the Court did not find them to be adverse to Solvay.

FRE 404 states that evidence of a person's character "is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." This Circuit has also held that character evidence "is not

51

admissible for the purpose of proving that a person acted in conformity therewith on a particular occasion." *Rocky Mountain Helicopters, Inc. v. Bell Helicopters Textron*, 805 F.2d 907, 917 (10th Cir. 1986). "This limitation exists because character evidence is generally regarded as being of slight probative value and potentially very prejudicial." *Id.*; *accord*, *McCormick on Evidence*, §188.

It was an abuse of discretion for the District Court to rely on an inadmissible snippet of character evidence for the conclusion that Solvay did not intentionally fail to provide the information required by ERISA §204(h), while ignoring the witness's testimony about Egbert's and Allen's actual conduct. The District Court's focus on Maxfield's character evidence also demonstrates that the Court was applying the wrong legal standard, effectively requiring proof of a "conscious decision to distribute a deficient 204(h) Notice" as Defendants had proposed in their summary judgment motion and proposed conclusions of law. *See* JA 140, 1559.

The District Court further abused its discretion by arbitrarily determining that "Solvay's intent was to provide a compliant 204(h) notice to participants" "based on the credible testimony of Allen, Egbert, Misthos, Schlaefer, and Maxfield," JA 26, when, except for Maxfield, these individuals were all impeached at trial. *See* Facts ¶45.  The District Court failed to explain how it

found these witnesses credible even when they were impeached. Without distinguishing the impeached testimony or providing any other factual basis, the District Court's conclusion that "Solvay's intent was to provide a compliant 204(h) notice to participants" based on the "credible" testimony of Allen, Egbert, Misthos, and Schlaefer, was arbitrary. *See, e.g., Anderson*, *supra*, 470 U.S. at 575.

## V.    The District Court Erred in Ruling that Solvay Never "Discovered" the Failure to Describe How Early Retirement Benefits Were Calculated.

Under ERISA §204(h)(6)(B)(i), the failure to "promptly" provide the required information after a plan administrator discovers an "unintentional failure" to meet the ERISA §204(h) notice requirements is an "egregious" violation. *Brady v. Dow Chemical Co.*, *supra*, held that Dow "committed an egregious violation of the 204(h) notice requirements" by "fail[ing] to promptly rectify its deficient notice after being put on notice of it." 311 Fed.Appx. at 633-34.  Dow "knew that multiple plan participants were confused" about an amendment based on "several inquiries" from employees. *Id*. at 633. *Brady* holds that the employer must know that employees do not understand "the effect of the plan amendment," not that the employer must discover a *per se* violation of the law.

Here, the District Court's decision on summary judgment agreed that "discovery includes both actual and constructive knowledge." JA 144. The District

Court also found a genuine issue of material fact about whether Solvay had

discovered an unintentional failure to provide the required information: "The

record does indicate that multiple employees requested side-by-side comparisons

of their early retirement benefit calculations...those emails at least create a genuine

issue of material fact as to whether the administrators discovered employees were

having trouble making the calculations themselves." JA 145.

At trial, the Plaintiffs demonstrated that Solvay was on notice that

employees did not understand the effect of the plan amendments on their early

retirement benefits, including through: (1) employee meetings where employees

complained about the "loss" of the Rule of 85 early retirement benefit, Facts ¶55,

including Maxfield's confrontation with Allen before the meeting in Green River

about intentionally misleading the employees about the changes being "value

neutral," Facts ¶¶68-69; (2) the "barrage" of questions from employees after the

meetings asking for comparative information, Facts ¶¶70-71; (3) Allen's

awareness that 98 or 99% of the employees were selecting lump sums instead of

the more valuable "protected" early retirement benefits, Facts ¶54; (4) Egbert's

and Allen's policy of not disclosing "the kind of information" that would

"invite...comparisons" in order to minimize employee dissatisfaction with the

changes, Facts ¶73; and (5) the employee "discontent" over "los[ing] out on early

retirement benefits or rule-of-85 benefits" recognized in a review of the changes

conducted in September 2005. Facts ¶72.

Plaintiffs presented substantial circumstantial evidence that employees were

confused and discontent about the early-retirement changes, in particular the loss

of the "Rule of 85" benefits. Facts ¶¶52-55, 70-72. The District Court concluded,

however, that "the queries from the ... employees...did not lead to a discovery by

Solvay of its failure" to disclose. JA 39-40. Instead, the District Court found that:

> The majority of the inquiries discussed at trial concerned the
> grandfather cutoff, and the employees most upset about the
> conversion knew they were losing significant benefits by the
> conversion. Nothing at trial indicated that any employees did not
> understand their benefits under the old plan, or that they would be
> losing the premier early-retirement benefits of the old plan. They
> were indeed most upset about losing those benefits.

JA 40.

Even the District Court's rendition recognizes that Solvay knew the

employees were "most upset about losing those [early-retirement] benefits." But

Solvay did not "promptly," or ever, tell the employees how to compare the old and

the new early retirement benefits, or explain how early-retirement benefits were

"protected", i.e., "how early-retirement benefits are calculated under the new plan

insofar as the new plan incorporates some benefits under the old plan." 625 F.3d at

655. Contrary to the District Court's statement, moreover, the employees testified

55

that they "did not understand their benefits under the old plan" or the extent to which the old plan benefits were "protected" under the new plan. Facts ¶53. Employees consistently testified that they never knew that a 3% or 4% reduction was considered "subsidized." Facts ¶48. Named Plaintiff Goff testified that until the first day of trial he thought the "Rule of 85" benefit was completely "lost." Facts ¶53. Maxfield likewise testified that he did not understand the concept of protected benefits "until recently." *Id*. No one understood the "protected" benefit meant that employees were still able to "grow into" early retirement eligibility under the old plan rules. *Id*.

According to the Director of Compensation and Benefits, Solvay was aware of the protection of early retirement benefits in 2004, before it made these changes. Facts ¶14. But the protection of the old early retirement benefits was not explained in any communication, including the 204(h) notice, the SMM, the SPD, and benefit election materials. Facts ¶¶55-58, 61. Allen also admitted that Solvay had a financial stake in not explaining how the early retirement benefits were "protected" because it would perpetuate the Plan's "volatility." Facts ¶54. But Allen's videotaped presentation shows him misleading the employees that the early retirement benefits under cash balance were better because the 3% reduction was gone. Facts ¶64.

Instead of choosing to fully disclose, Egbert and Allen decided that Solvay would refuse to provide "the kind of information [employees] are asking for because it invites them to do comparisons," Facts ¶73, even though comparisons are precisely what the statute and regulations require. This policy of not providing "the kind of information" that "invites ... comparisons" did not just exist in one email string uncovered in discovery. Solvay could not find a single example where it explained how the Rule of 85 or early retirement with the 3% reduction were "protected."

Based on the preponderance of evidence in this record, the District Court could not reasonably conclude that Solvay never discovered its employees did not have the required information. Contrary to the District Court's decision, not a single witness, much less a "majority," asked about the "grandfather cut-off" as distinct from the loss of early retirement benefits. Instead, the employees uniformly testified that they complained about the loss of the "Rule of 85" and were told nothing about how that benefit or any other early retirement benefit was protected. Facts ¶53.

The District Court's opinion suggests that it would only find that Solvay "discovered" the failure if employees explicitly asked Solvay to explain how the "protected minimum benefit" applied to the "Rule of 85" benefit without

57

mentioning anything in the same communication related to the "grandfather cutoff." But fiduciary duties are not satisfied by refusing to provide information until a beneficiary phrases his or her question in a technical way. "[R]egardless of the precision of his questions, once a beneficiary makes known his predicament, the fiduciary is under a duty to communicate...all material facts in connection with the transaction which the trustee knows or should know." *Eddy v. Colonial Life Ins. Co.*, 919 F.2d 747, 751 (D.C. Cir. 1990); *accord, Bixler v. Central Pa. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1300 (3d Cir. 1993) ("fiduciary's obligations will not be excused merely because [beneficiary] failed to ... ask about a technical aspect of the plan"); *Horn v. Cendant Operations, Inc.*, 69 Fed.Appx. 421, 427 (10th Cir. 2003).

By ignoring Plaintiff's evidence as set out in Paragraphs 99-105 of their Proposed Findings (JA 1478-81) that Solvay knew employees "in their 40's," were confused about the effect of the amendments on their early retirement benefits, particularly the "Rule of 85," Facts ¶¶70-72, the District Court abused its discretion. The trial testimony and exhibits demonstrated that Solvay knew about the extent to which early retirement benefits were required to be "protected" under the new plan, but did not "promptly" provide that information, and indeed, did not disclose that protection until February 2011–six months after this Circuit's

decision (*see* JA 2522-2531). Rather than disclose the information employees

were entitled to, Solvay adopted a policy antithetical to the law, but aligned with

its financial interests, of refusing to provide the "kind of information" that "invites

... comparisons." By adopting that policy and refusing to provide the required

information, Solvay violated the duty in ERISA §204(h)(6)(B)(i) to "promptly"

rectify any unintentional failure to provide the required information.

## VI.    The District Court Erred in Ruling that this Circuit Did Not Remand for a Determination of Whether Solvay's Summary of Material Modifications ("SMM") Failed to Disclose How Early Retirement Benefits Are Calculated.

Under ERISA §102(a), 29 U.S.C. §1022(a), a Summary of Material

Modification ("SMM") must be provided to participants within 210 days after the

end of a plan year in which material changes are made to a plan's benefits,

including changes that cause benefits a participant might reasonably expect to be

reduced or lost. 29 C.F.R. 2520.102-2(a) and 2520.104b-3(a). The SMM must be

"written in a manner calculated to be understood by the average plan participant."

Solvay maintains that its SMM about the cash balance changes consisted of

the 204(h) notice and its "FutureChoice" brochure. JA 24. This Circuit's

September 2010 decision held there may have been a violation of the SMM

requirements in ERISA §102(a): "[W]e hold that Solvay's SMM was not deficient,

except for the possibility that §1022(a) required disclosure of the old plan's

method of calculating early-retirement benefits" to disclose "how the new plan differed from the old." 625 F.3d at 657-58. "We need not address that possible violation, however, because we have held that the failure to disclose violates 26 C.F.R. § 54.4980F-1, A-11(a)(3)(ii), so remand is required in any event." *Id*. at 658. The remand suggests the district court is to reach the "possible" §102(a) violation after addressing the 204(h) remedy, because "Plaintiffs have not suggested that any additional remedy would be available for a violation of [§102(a)]." *Id*. at 657.

This Circuit's judgment directed the District Court to conduct "further proceedings in accordance with the opinion of this court." JA 84. The District Court instead focused on the "Order on Mandate," which was the District Court's own order. JA 40, 85. A district court obviously cannot restrict this Court's mandate with its own order. *See, e.g., United States v. Graham*, 394 Fed.Appx. 479, 481 (10th Cir. 9/7/2010).

If the District Court would not find an "intentional failure," or a failure to "promptly" rectify an "unintentional failure," under ERISA §204(h)(6)(B), the District Court was required to reach the ERISA §102(a) violation. A violation of ERISA §102(a) can be remedied under ERISA §502, regardless of whether the violation is the result of an intentional failure, or a failure to promptly correct an

60

unintentional failure. *See, e.g.*, *Frommert*, *supra*, 433 F.3d at 268. The Treasury

Department has expressly taken the position that "where there is a failure, whether

or not egregious, to provide section 204(h) notice in accordance with this section,

individuals may have recourse under section 502 of ERISA." Treas. Reg.

54.4980F-1, Q&A 14(b); *accord*, 67 F.R. 19713, 19717 (April 23, 2002). The

Treasury regulations are statutorily-authorized and entitled to deference under

*Chevron, U.S.A. v. NRDC*, 467 U.S. 837, 843-44 (1984).

Nevertheless, the District Court stated it was "not persuaded by Employees'

argument that the Tenth Circuit's single choice of words indicating a possible

§102(a) violation overcomes the remainder of the Tenth Circuit's opinion

mandating this Court only consider the single claim for the §204(h) violation and

whether relief is proper (whether the failure was egregious)." JA 42. This is wrong

for three reasons: First, the judgment directs the District Court to "conduct further

proceedings in accordance with the opinion of this court"; it does not direct the

Court to "only consider the single claim for §204(h) violation." Second, this

Circuit's precedents require the Court to consider the entire opinion, which

includes the "choice of words indicating a possible §102(a) violation." *See, e.g.*,

*Estate of Whitlock v. Commissioner*, 547 F.2d 506, 510 (10th Cir. 1976). Third,

the District Court's position would effectively dismiss Plaintiffs' ERISA §102(a)

claim, which was pled in the original Complaint, JA 66-67, without the District

Court or this Circuit ever resolving that claim.

**VII.    In Light of *CIGNA Corp. v. Amara*, the District Court Erred in Ruling that "Extraordinary Circumstances" Is a Prerequisite to Equitable Relief for Violations of ERISA §§102(a) and 204(h).**

The District Court found that "[e]ven if the Tenth Circuit had remanded this

case to this Court to consider more than the single issue of the §204(h) violation,

Employees would still not be entitled to equitable relief under §502(a)(3) by

simply proving a violation of §102(a)." JA 42. The District Court relied on

*Ackerman v. Warnaco, Inc*., 55 F.3d 117, 124-25 (3d Cir. 1995), to rule that

Plaintiffs must demonstrate "extraordinary circumstances" to be entitled to such

relief. *Id*. The District Court appears to ceded that the employees established an

ERISA §102(a) violation, but concludes they were not entitled to equitable relief

because they did not present evidence of "extraordinary circumstances." *Id*.

This ruling is not based on any precedent in this Circuit and is at odds with

the Supreme Court's decision in *CIGNA Corp. v. Amara*, 131 S.Ct. 1866 (2011),

that "equity suffers not a right to be without a remedy," and that equitable relief

can be obtained for disclosure violations without proving requirements that do not

"come from the law of equity" or the statutory scheme. *Id*. at 1879, 1881. *Amara*

does not authorize the courts to fashion additional prerequisites that are not

62

"impose[d]" by "the specific remedy being contemplated" or the statute. *Id*. The Supreme Court specifically found that the statutory requirements for SPD/SMM violations do not "set forth any particular standard for determining harm." *Id*. Therefore, following *Amara*, the "extraordinary circumstances" standard of "bad faith, active concealment, or detrimental reliance," *Lettrich v. J. C. Penney Co.*, 213 F.3d 765, 771 (3d Cir. 2000), cannot be imposed as a prerequisite to equitable relief.

In *Tomlinson v. El Paso Corp.*, 653 F.3d 1281, 1295 (10th Cir. 2011), this Circuit already addressed *Amara*'s instruction not to develop prerequisites to relief unless "the specific remedy being contemplated imposes such a requirement." *Tomlinson* recognizes that *Amara* "rejected [the] reliance requirement" in *Chiles v. Ceridian Corp.*, 95 F.3d 1505, 1519 (10th Cir. 1996), because reliance is "not always necessary for other equitable remedies" than estoppel. *Id*. at 1295. *Tomlinson* decided that "for the injunctive relief sought by the plaintiffs, it would be sufficient to show harm caused by El Paso's breach of ERISA §102, 29 U.S.C. §1022." *Id*.

Here, as in *Amara*, it should have been sufficient for Plaintiffs to show "harm" from the loss of the statutory right to information caused by Solvay's breach of ERISA §§102(a) and 204(h). Plaintiffs' trial witnesses testified about

how their actions could have been different if they understood that the "Rule of

85" was protected or that an annuity with a 3% reduction was more valuable than a

lump sum. JA 349-50, 1095. Without disclosure, employees were denied the

"opportunity to contest or react to the switch" and protect their financial interests.

131 S.Ct. at 1885 (Scalia, J., concurring).

**Conclusion**

For the foregoing reasons, Plaintiffs-Appellants respectfully request that the

District Court's judgment be reversed.

**Oral Argument Request**

Counsel for Plaintiffs-Appellants believe oral argument will significantly

aid the Court in this appeal's determination because the issues are complex, of first

impression in this Circuit, and of great importance to thousands of employees'

retirement income.

Dated: January 31, 2012

s/ Stephen R. Bruce
Stephen R. Bruce
Allison C. Pienta
805 15th St., NW, Suite 210
Washington, DC 20005-2271
Telephone: (202) 289-1117
Fax: (202) 371-0121
Email: stephen.bruce@prodigy.net

s/ Richard Honaker

Richard H. Honaker
P.O. Box 366
Rock Springs, WY 82902-0366
Telephone: (307) 362-5800
Fax: (307) 362-5890
Email: honakerlaw@wyoming.com

Attorneys for Plaintiffs-Appellants

## Orders and Judgment to Be Reviewed

1.    October 11, 2011 Findings of Fact and Conclusions of Law.

2.    October 11, 2011 Final Judgment.

3.    October 28, 2010 Order on Mandate.

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

OCT 11 2011

Stephan Harris, Clerk
Cheyenne

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

WADE JENSEN and DONALD D. GOFF,
individually and on behalf of all others
similarly situated,

Plaintiffs,

v.

Case No. 06-CV-273-J

SOLVAY CHEMICALS, INC., SOLVAY
AMERICA, INC., and SOLVAY AMERICA
COMPANIES PENSION PLAN,

Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This is a class-action case alleging numerous violations of ERISA and the ADEA
by Solvay Chemicals, Inc., Solvay America, Inc., and the Solvay America Companies
Pension Plain (collectively, Solvay). Plaintiffs Wade E. Jensen and Donald G. Goff
(Employees) represent themselves and a class of current and former employees of Solvay.
The complaint alleges the violations stemmed from Solvay's conversion of its retirement
benefits calculation from a final average pay formula to a cash-balance formula.

After this Court originally granted summary judgment to Solvay on all the claims,
the Tenth Circuit affirmed on most of the claims and reversed on this Court's ruling
concerning the sufficiency of Solvay's ERISA § 204(h) notice describing the calculation

of early-retirement benefits. The Tenth Circuit held that Solvay's notice concerning those

benefits was deficient and remanded to this Court to determine whether the deficiency

was an egregious failure under § 204(h). The parties also dispute whether the § 204(h)

issue is the only one properly before the Court, or whether the Tenth Circuit also

remanded the case on Solvay's ERISA § 102(a) claim. The Court held a non-jury trial

from July 11, 2011 through July 18, 2011. Having considered the evidence and arguments

of the parties, the Court makes the following findings of fact and conclusions of law:

### Findings of Fact

1. Employees presented testimony from the following witnesses:

(a) Plaintiffs Wade E. Jensen (current Solvay Chemicals employee) and

Donald Goff (former Solvay Chemicals employee). (Stipulated and Uncontroverted Facts

[hereinafter Stip.], Doc. 182,  2-3; Trial Tr. vol. I, 37:9-89:9, 7/11/11; Trial Tr. vol. III,

491:9-553:6.)

(b) Six class member representatives: Debra Godwin (former Solvay

Pharmaceuticals employee), Janet Christensen (current Solvay Chemicals employee);

James Maxfield (current human resources manager for Solvay Chemicals), Brian

Liscomb (current Solvay Chemicals employee), Kari Mulinix (former Solvay Chemicals

employee), and Rose Saganich (former Solvay Pharmaceuticals employee). (Trial Tr. vol.

2

**JA-2**

I, 89:20-122:3; Trial Tr. vol. II, 197:18-205:9, 205:17-268:17, 7/12/11; Trial Tr. vol. III, 458:1-476:23, 477:7-490:23; Trial Tr. vol. V, 841:22-861:13.)

(c) Expert witness Claude Poulin, Fellow in the Society of Actuaries, designated as an actuarial expert. (Trial Tr. vol. II, 134:2-186:22.)

(d) Two Solvay management representatives: Carolyn Egbert (former Vice President of Human Resources for Solvay America) and Scott Allen (Vice President and Manager of International Compensation and Benefits for Solvay North America). (Stip. at 4-5; Trial Tr. vol. II, 269:22-337:17; Trial Tr. vol. III, 344:4-457:14; Trial Tr. vol. IV, 564:11-741:12, 7/14/11; Trial Tr. vol. V, 747:7-841:7.)

(e) Three witnesses through deposition testimony: Philip Uhrhan (former Chief Financial Officer of Solvay America), Paul Zeisler, Associate in the Society of Actuaries (previously designated as a rebuttal expert witness for Solvay), and Paul Harding (former Senior Vice President of Human Resources for Solvay North America, LLC, currently Senior Vice President for Solvay Advance Polymers, LLC). (Trial Tr. vol. II, 130:6-131:2 (Uhrhan Dep. 4:17-5:4), 190:6-195:17; Trial Tr. vol. V, 861:14-865:21 (Harding Dep. 5:6-16).)

2. Solvay presented testimony from the following witnesses:

(a) Cindy Schlaefer, attorney and partner at the law firm of Pillsbury

3

**JA-3**

Winthrop Shaw Pittman LLP (Pillsbury), who concentrates her practice in employee

benefits, tax, and ERISA and provides legal advice regarding the pension plan. (Stip. at 6;

Trial Tr. vol. VI, 1059:5-1060:6.)

(b) Nola Misthos, actuary with Towers Watson, formerly Towers Perrin

(Towers), who is the enrolled actuary and the lead actuary consultant for the pension plan.

(Stip. at 7; Trial Tr. vol. V, 867:8-903:6; Trial Tr. vol. VI, 907:14-1057:12.)

(c) Philip Uhrhan through deposition testimony (former Chief Financial

Officer of Solvay America). (Trial Tr. vol. VI, 1058:2-13.)

(d) Solvay also presented Egbert and Allen as witnesses in their case,

although for reasons of efficiency, their testimony was taken during Employees' case in

chief. (Trial Tr. vol. II, 269:4-11; Trial Tr. vol. IV, 563:25-564:3.)

3. The Court received into evidence 73 exhibits labeled by the plaintiffs and 138

labeled by the defendants. Many of the parties' exhibits overlapped and some were

offered by the opposing party. (Doc. 211.)

*The Pension Plan*

4. The Solvay America Pension Plan is an employee pension benefit plan.

Employees of Solvay Chemicals and other affiliated companies participate in the Solvay

America Pension Plan. (Stip. at 2.)

4

**JA-4**

5. Concerning the Solvay Americas Pension Plan, Solvay served as both the plan

administrator and sponsor. As such, Solvay had a non-delegable responsibility to

distribute a § 204(h) notice to its employees that complied with ERISA § 204(h) and its

applicable regulations. (Trial Tr. vol. II, 288:25-289:11; Trial Tr. vol. VI, 632:2-8,

1092:15-24.)

6. Before January 1, 2005, the Solvay America Pension Plan (the old plan)

determined the annual retirement benefit for an employee retiring at age 65 under a final

average pay formula. That formula multiplies the employee's years of qualified service by

1.1% of the employee's highest average five-year compensation (plus a smaller

percentage of the portion of that compensation exceeding the "Covered Compensation"

for persons of that age in the current Internal Revenue Service table, *see* Rev. Rul.

2003-124, 2003-2 C.B. 1173 (2004 Covered Compensation Table)). *Jensen v. Solvay*, 625

F.3d 641, 643 (10th Cir. 2010); (Ex. 1 at Solvay 000031–000144.)

7. The old plan defined "early retirement benefit" as "the benefit to which a

Participant is entitled upon attainment of his Early Retirement Date while in the service of

an Employer as set forth in Section 4.4 herein" and set forth three different early-

retirement benefits for which a participant might qualify. The earliest age for retirement

under the plan was age 55. (Trial Tr. vol. II, 137:22-138:3; Ex. 1 at Solvay 000042; Stip.

5

**JA-5**

at 2.)

8. The first and most easily attained early-retirement benefit under the old plan covers a plan participant who terminates employment before age 55. At age 55 or later, that participant would be entitled to receive a benefit equal to the benefit payable at the normal retirement age of 65, reduced by 4 percent for each year the retirement preceded age 65. Such a participant's benefit at age 55 would be 40 percent less than the accrued age-65 benefit. For example, if the accrued age-65 benefit were $1,000 per month, the participant's accrued early-retirement benefit would be $600 per month. (Trial Tr. vol. II, 138:15-139:2; Ex. 1 at Solvay 000042; Stip. at 2.)

9. The second early-retirement benefit under the old plan covers a plan participant who retires at or after age 55, but before age 65. In that case the participant would be entitled to receive a benefit equal to the benefit payable at the normal retirement age of 65, reduced by 3 percent for each year the retirement preceded age 65. Such a participant's age-55 benefit would be 30 percent less than the accrued age-65 benefit. For example, if the accrued age-65 benefit were $1,000 per month, the participant's accrued early-retirement benefit would be $700 per month. (Trial Tr. vol. II, 139:3-12; Ex. 1 at Solvay 000042; Stip. at 2.)

10. The third early-retirement benefit under the old plan is referred to as the "Rule

6

of 85." This covers a participant who has attained age 55, and whose years of service plus
age add up to 85 points or more. In that case, the participant is entitled to receive the
entire accrued age-65 benefit without any reduction. For example, if the accrued age-65
benefit were $1,000 per month, the participant's accrued early-retirement benefit would
be $1,000 per month. (Trial Tr. vol. II, 139:13-21; Ex. 1 at Solvay 000042; Stip. at 2.)

 11. Solvay's summary plan description (SPD) advised plan participants that they
could retire anytime after reaching age 55, and provided them with the following
"formula for calculating" early-retirement benefits, (Ex. 2 at 9), which the parties have
stipulated is controlling (Trial Tr. vol. II, 284:20-25):

> If you terminate employment with the company at age 55 or above and the sum
> of the number of your years of benefit service and your age at the date of
> termination is equal to or greater than 85, the early retirement benefit will
> equal the normal retirement benefit you have earned at retirement based on
> your Benefit Service, Highest Average Compensation and Covered
> Compensation, with no reduction for early commencement.

> If you terminate employment with the company at age 55 or above and the sum
> of the number of your years of benefit service and your age at the date of
> termination is less than 85, the early retirement benefit will equal the normal
> retirement benefit you have earned at retirement based on your Benefit
> Service, Highest Average Compensation and Covered Compensation, but
> reduced 3% for each year you receive benefits early.

> For any participant who terminates employment with the company prior to age
> 55, the early retirement benefit will equal the normal retirement benefit you
> have earned at retirement based on your Benefit Service, Highest Average

7

**JA-7**

Compensation and Covered Compensation, but reduced 4% for each year you receive benefits early.

12. Pension plan participants as well as human resource representatives had access to this SPD from the time it was issued in January 2003 through the conversion effective January 1, 2005, and until it was updated and replaced in 2005. (Trial Tr. vol. 5, 774:21-775:20.)

13. The old plan was converted into a cash-balance pension plan (the new plan) by the adoption of the "Sixth Amendment" to the Plan, effective January 1, 2005. (Ex. 1, Solvay 000145-000155; Ex. N7.) The Sixth Amendment was drafted by Solvay's outside ERISA counsel, Cindy Schlaefer, (Trial Tr. vol. IV, 1065:6-7, 1065:15-19), and was executed by Solvay's then-President and CEO, David Birney, on December 28, 2004. (Stip. at 4; Ex. 1 at Solvay 000155.)

14. The new plan offered individual accounts similar to savings accounts except that these accounts are hypothetical. An employee's opening account balance is established based on the employee's accrued benefits under the old plan. Pay credits (which increase from 2.5% of pay with less than 40 age and service points to a maximum of 5% of pay with 80 or more age and service points) and interest credits (based on 30-year Treasury bond yields) are assigned to this account on a quarterly basis. (Ex. 1 at

8

**JA-8**

Solvay 000147-000148.) The annuity benefit at age 65 is determined by projecting the

cash-balance account with interest to age 65 and converting it to an annuity by applying

the interest rate and mortality table specified in the plan. (Trial Tr. vol. II, 139:22-

141:19.)

16. Under the new plan, early-retirement benefits are "subject to [an] actuarial

reduction" from the accrued benefit payable at age 65. (Ex. 1 at Solvay 000145-000146,

000150; Trial Tr. vol. II, 139:22-142:11.) An actuarial reduction is equivalent to a

reduction of approximately 5.3% for each year by which retirement precedes age 65.

(Trial Tr. vol. II, 141:8-142:1.) This leaves an early-retirement benefit of only 47% of the

age 65 accrued benefit for a retirement at age 55. (Trial Tr. vol. II, 141:20-142:11.) Both

parties' actuaries agreed that an actuarial reduction provides between 45 and 50% of the

accrued benefit for a retirement at age 55. (Trial Tr. vol. VI, 927:23-928:7.) For example,

under the new plan, if the accrued benefit at age 65 were $1,000 per month, the age-55

early-retirement benefit would be $470 per month. (Trial Tr. vol. II, 139:22-142:11,

172:9-14; Trial Tr. vol. VI, 931:17-18.)

16. The Sixth Amendment provided that employees who were over age 50 and had

more than 10 years of benefit service were offered the opportunity to elect to stay under

the old plan (be grandfathered). (Ex. 1 at Solvay 000145.)

9

**JA-9**

17. For those employees not grandfathered, the reductions in early-retirement benefits caused by the conversion to the new plan were significant. For employees who might have been eligible for the Rule of 85, a $1,000 per month benefit could be reduced down to approximately $470 per month. (Trial Tr. vol. II, 141:20-142:11.) For employees who reached age 55 but were not eligible for the Rule of 85, early-retirement benefits could fall from $700 per month down to approximately $470 per month. (Trial Tr. vol. II, 173: 11-20.)

18. Even under the new plan, a participant continues to have a legally-protected interest in the early-retirement benefit that he or she accrued under the old plan. That legal protection is established by ERISA §204(g)(1) and (2) and is also set forth in Section 10.2(b)(ii) of the plan document which provides that "no amendment shall be permitted that would have the effect of eliminating or reducing an early retirement benefit or a retirement-type subsidy . . . with respect to a Participant's Accrued Benefit." (Ex. 1 at Solvay 000100.) As a result of this protection, if a participant retires under the new plan, the participant is still entitled to the early-retirement benefit actually accrued under the old plan before the conversion if that benefit is higher than what the participant is entitled to under the new plan. (Trial Tr. vol. II, 142:14-143:1;) § 204(g)(2)(A).

19. These protected benefits also contain within them a right to "grow into"

10

**JA-10**

eligibility if the participant is not eligible for early retirement at the time of the conversion. For example, if a participant was age 50 at the time of the plan conversion and is now age 55 and still working for Solvay, the participant could retire and receive the age-65 benefit, reduced by 3% for each year between ages 55 and 65. (Trial Tr. vol. II, 143:3-19.) This is called the "protected" benefit or the "protected minimum" benefit. If the protected benefit exceeds the retirement benefit available under the new plan, the participant is entitled to receive the higher amount. (Trial Tr. vol. II, 142:12-143:19.) Solvay understood the nature of this protected benefit. (Trial Tr. vol. IV, 582:12-24; Trial Tr. vol. V, 789:18-21.)

20. A plan participant could not only grow into eligibility for the 3% per year reduction by working until age 55, but could also grow into the Rule of 85. If the participant was not age 55 at the time of the conversion, but continued to work for Solvay and later turned 55 and had 30 years of service, he could retire and receive the full, unreduced age-65 pension benefit that was available under the old plan. To the extent that the Rule of 85 was an accrued benefit under the old plan, it continued to exist under the new plan. (Trial Tr. vol. II, 148:10-24, 149:19-150:3.)

21. Plaintiff Goff's situation illustrates the concept of a growing into a protected benefit. Goff's employment with Solvay terminated in 2005 at age 49, and he is now age

11

**JA-11**

55. Under the old plan, Goff's accrued age-55 benefit was $1,029 per month, which

equaled his age-65 benefit of $1,715 multiplied by 60 percent (4 percent per year

reduction between ages 55 and 65). (Trial Tr. vol. II, 143:20-25; 144:9-145:2; Ex. G-2.)

Employees' actuary calculated that Goff's protected benefit under the old plan is superior

in value to his benefit under the new plan for a period of some 11 years after the

conversion. (Ex. G-2.)

22. Shortly after Goff's termination, he received an application for benefits from

Solvay, indicating that he was entitled to a lump sum under the new plan or a single life

annuity of only $573.47 under the new plan. The application did not advise Goff of the

existence of the protected benefit that he could grow into, i.e., that he was entitled to a

monthly annuity of $1,029 if he were to wait until age 55 to commence benefits. The

application, did however, explain to Goff that he may be eligible for additional payment

options, and he should call for more information. (Trial Tr. vol. II, 147:8-148:9,

148:21-24, 178:9-180:17; Trial Tr. vol. III, 526:8-16; Trial. Tr. vol. IV, 672:23-673:1,

673:18-20, 674:2-21; Ex. 61.)

*Leading Up to the Conversion*

23. In the early 2000s, funding for the pension plan was volatile and unpredictable.

(Trial Tr. vol. IV, 681:9-23, 683:9-684:6.) During this time, the equities markets were

12

**JA-12**

down and interest rates were low. (Trial Tr. vol. III, 356:18-357:3; Trial Tr. vol. IV,

683:23-684:6.)  Egbert testified that these economic conditions caused volatility in

pension plan funding as the company could not adequately predict how much it would

have to contribute to the Pension Plan to maintain proper funding. (Trial Tr. vol. III,

356:18-357:23.) As the company was responsible for 100% of Pension Plan funding, the

volatility was unacceptable as it required unexpected monetary contributions that were

not originally budgeted to funding the Pension Plan. (Trial Tr. vol. III, 357:4-358:12;

Trial Tr. vol. IV, 681:9-23.) With the magnitude of funding volatility, it was determined

that the old plan was not sustainable. (Trial Tr. vol. IV, 683:23-684:21.)

    24. While Solvay's figures disclose a problem with funding volatility, they also

disclose that Solvay undercontributed to the plan by nearly $40 million from 1992

through 2002, contributing only $48.3 million while paying out benefits totaling $88

million. (Ex. 14 at 6-7; Ex. U-1 at 12-13.) During the time Solvay was considering a

pension plan conversion, the plan's assets were $99 million less than its liabilities. (Ex.

I1; Trial Tr. vol. III, 380:19-381:11, 448:1-14.)

    25. In early 2003, Egbert received the directive to reduce the funding volatility of

the pension plan. (Trial Tr. vol. III, 372:8-14; Trial Tr. vol. IV, 656:19-22.)

    26. To analyze the company's various alternatives, on or about May 2003, Egbert

13

**JA-13**

and Allen engaged Towers to analyze Solvay's current retirement benefits as well as the

benefits of other companies within the chemicals and pharmaceuticals market and to

present various alternatives for reducing funding volatility. (Trial Tr. vol. III,

354:22-359:14; Trial Tr. vol. IV, 684:22-685:1, 686:10-18; Trial Tr. vol. V, 872:6-21; Ex.

C1.) The primary Towers actuaries working on the project were John Markson, who was

the pension plan lead actuary at that time, and Misthos, who later became the pension

plan lead actuary. (Trial Tr. vol. IV, 685:6-10; Trial Tr. vol. V, 871:1-10, 872:22-873:16;

Ex. C1.)

    27. In August 2003, Markson and Misthos presented Egbert and Allen with the

analysis of Solvay's current benefits and their competitiveness in the market. (Trial Tr.

vol. III, 369:11-375:17; Trial Tr. vol. IV, 686:10-688:17; Ex. F1.) Specifically, Towers's

presentation advised Egbert and Allen that the values of their existing benefits were 33%

higher than the average chemical industry program and 19% higher than the average

pharmaceutical industry program. (Ex. F1 at ESOLVAY00124849.) Towers's

presentation also advised Egbert and Allen that Solvay's pension plan benefits were

currently equal to the chemical industry average and 21% above the pharmaceutical

industry average, while Solvay's savings plan benefits were 20% above the chemical

industry average and more generous than the pharmaceutical industry average. (*Id.*; Trial

14

**JA-14**

Tr. vol. VI, 686:22-687:7.)

28. The August 2003 presentation by Markson and Misthos also provided Egbert

and Allen with various alternatives to the old plan. (Trial Tr. vol. III, 369:11-375:17; Trial

Tr. vol. IV, 686:10-688:17; Ex. F1.) Egbert testified that the alternatives ranged from

terminating the old plan to converting to a cash-balance formula while enhancing features

of the savings plan. (Trial Tr. vol. III, 372:22-373:10; Ex. F1.) Allen testified that Towers

advised him and Egbert that "there was a distinct movement within the chemical industry

towards what [he] would call hybrid plans, like cash balance plans . . . ." (Trial Tr. vol.

IV, 687:8-14.) Misthos also testified that "Solvay's peer companies were showing a trend

of either starting to provide savings plan only benefits to employees or to, you know,

change their traditional final average pay plans over to like a cash balance plan." (Trial

Tr. vol. V, 882:9-13.)

29. In light of the cash-balance alternative, as well as certain court decisions and

surrounding legislative uncertainty regarding cash-balance plans, in late 2003, Egbert

retained Schlaefer and Pillsbury to provide legal advice regarding the state of cash-

balance formula conversions. (Trial Tr. vol. III, 349:2-23; Trial Tr. vol. VI,

1061:3-1064:19; Ex. 4; Ex. 34.) In November 2003, Schlaefer provided Egbert with a

memorandum discussing recent developments regarding cash-balance plans. (Ex. 4; Trial

15

**JA-15**

Tr. vol. VI, 1061:20-1062:19.) Specifically, Schlaefer's memorandum advised Egbert that

Pillsbury believed that cash-balance plan designs do not inherently violate age

discrimination laws and that the recent court decisions holding the opposite are

misguided. (Ex. 4.) Schlaefer's memorandum also advised Egbert that if the old plan was

converted to a cash-balance formula, Solvay could minimize the risk of litigation if full

disclosure regarding the change was made to participants. (*Id.*) Schlaefer later updated the

memorandum in October 2004 with new developments in the cash-balance landscape, but

adhered to Pillsbury's opinion that cash-balance plans are not inherently age

discriminatory. (Trial Tr. vol. VI, 1062:25-1064:19; Ex. 34.) Schlaefer's 2004

memorandum also advised that Solvay could minimize the risk of litigation by providing

full disclosure to participants regarding the conversion. (Ex. 34.)

     30. Egbert and Allen continued to work with Markson and Misthos through 2003

and 2004 to finalize the proposed terms of the conversion. (Trial Tr. vol. III, 378:23-

379:12, 380:2-381:1; Ex. K1.) During this time, Egbert presented the various alternatives

to the Executive Committee, the Solvay America Board of Directors, and the Solvay

America Pension Plan Investment Committee. (Trial Tr. vol. III, 375:25-378:18, 383:11-

24; Trial Tr. vol. IV, 687:23-688:3; Ex. J1; Ex. R1; Ex. S1.)

     31. In early 2004, the Solvay Investment Committee decided to move forward with

**JA-16**

the cash-balance alternative. (Trial Tr. vol. III, 350:14-355:3, 372:8-14, 385:6-17; Trial

Tr. vol. IV, 687:15-688:17; Ex. S1.) After this, Egbert and Allen presented the cash-

balance alternative to the Executive Committee, the Solvay America Board of Directors,

the Solvay America Pension Plan Investment Committee, and various senior human

resources managers. (Trial Tr. vol. III, 383:11-387:23, 389:18-390:23; Trial Tr. vol. IV,

701:18-702:2; Ex. J1; Ex. R1; Ex. S1; Ex. U1; Ex. B2; Ex. G2.)

     32. In June of 2004, the Executive Committee approved the proposed changes to

the Pension and Savings Plans. (Trial Tr. vol. III, 391:2-392:3; Ex. I2.)

     33. Misthos and Allen testified that the conversion was designed to be cost neutral

over the lifetime of the plans. (Trial Tr. vol. IV, 592:6-593:9; Trial Tr. vol. V,

877:20-879:13.) In other words, the conversion was designed such that over time there

would not be any large cost increase or decrease, even with the transition between

formulas. (Trial Tr. vol. VI, 877:20-879:13.)

     34. Specifically, before the conversion, Solvay understood the old plan's average

annual cost was approximately 5.3% of pay for the average employee. (Trial Tr. vol. IV,

690:20-696:3, 701:10-16; Ex. X9; Trial Tr. vol. VI, 882:15-884:19; Ex. 3.) In converting

to the new plan, the overall cost was reduced by 40%, bringing the average annual cost of

the Pension Plan down to approximately 3.3% of average employee annual pay (from the

17

**JA-17**

previous 5.3%). (Ex. 3; Ex. 5.)

35. Misthos, however, testified that the 5.3% was not an actual percentage based on Solvay's particular payroll, but instead was a score using Towers's BENVAL analysis. (Trial Tr. vol. VI, 1014:20-1015:11.) Regardless, Solvay understood the change in percentage from 5.3% to 3.3% to be the reason it needed to shift more money to the Savings Plan to keep the employees' beneefits value nuetral. (Trial Tr. vol. IV, 688:10-17.)

36. To achieve cost neutrality, the 2% cost differential was shifted from the Pension Plan to the Savings Plan, such that participants would be eligible for an additional 2% matching (from up to 7% to up to 9%). (Trial Tr. vol. IV, 690:20-692:19, 701:10-16; Ex. X9; Trial Tr. vol. VI, 1012:16-23; Ex. 3; Ex. 5.) In addition, an annual 1.25% transition contribution was provided to participants who were converted to the new plan. (Trial Tr. vol. IV, 692:20-693:16, 701:10-16; Ex. X9; Trial Tr. vol. VI, 1012:16-23; Ex. 3.)

*Preparing the § 204(h) Notice*

37. After the Executive Committee approved the decision to convert to the new plan, Allen and his team started the preliminary preparations on the communications materials concerning the conversion. (Trial Tr. vol. IV, 701:18-702:13; Trial Tr. vol. V,

18

**JA-18**

831:24-832:2.) Allen testified that on July 26, 2004, he sent Markson an email that noted

that "[w]e had a meeting this afternoon with our communications consultant and

discussed the 204h disclosure as related to our pension plan redesign." (Trial Tr. Vol. IV,

708:1-21; Ex. 9.) Allen then went on to ask Markson in the email, "Would you be able to

provide us with a document that outlines the specific disclosure requirements prescribed

under the statutes?" (Ex. 9; Trial Tr. vol. IV, 708:1-21.) In this email, Allen copied

Schlaefer because she was ERISA counsel, and copied Robyn Schaub, the

communications consultant from PartnerComm who was assisting with the preparation of

certain conversion communications materials, including the FutureChoice Brochure and

Decision Guide. (Ex. 9; Trial Tr. vol. IV, 703:15-24, 708:1-21.)

38. Allen testified that he also received an email from Schaub on July 27, 2004,

which included a sample 204(h) notice that PartnerComm had prepared for a different

client, which included the term "subsidized early retirement." (Trial Tr. vol. IV, 710:18-

712:11; Ex. T2). Allen testified that he forwarded that email to Markson and Schlaefer.

(Trial Tr. vol. IV, 710:18-21; Ex. T2.)

39. On July 27, 2004, Allen also received an email from Markson with an attached

memorandum from Towers that summarized the 204(h) notice regulations along with the

regulations themselves. (Trial Tr. vol. IV, 708:22-709:6; Ex. 10.) Allen testified that after

19

**JA-19**

reading through the documents, it became clear that the regulations contained a lot of

information, and that he did not have the ability to interpret what they meant. (Trial Tr.

vol. IV, 709:12-19). Allen and Egbert testified that they believed it was prudent to retain

Towers and Pillsbury to draft and edit the § 204(h) notice. (Trial Tr. vol. II, 288:16-20,

310:1-9, 332:9-14; Trial Tr. vol. III, 353:23-354:6; Trial Tr. vol. V, 795:20-21, 799:10-

12, 800:3-4, 801:3-5.)

40. Because Towers was already familiar with the pension plan and was already

assisting with the terms of the conversion, and based on their expertise and knowledge on

the § 204(h) regulations, as demonstrated through their memorandum on the subject, as

well as their expertise in actuarial and communications matters, Egbert and Allen

believed that Towers would be highly qualified to provide advice on the § 204(h) notice.

(Trial Tr. vol. II, 275:8-19, 294:1-10; Trial Tr. vol. III, 354:22-355:3; Trial Tr. vol. IV,

709:20-710:1; Ex. C1.)

41. Therefore, Allen and Egbert retained Towers to draft and provide advice about

the § 204(h) notice. (Trial Tr. vol. IV, 714:12-715:5; Ex. N3; Trial Tr. vol. V, 896:8-11;

Trial Tr. vol. VI, 1065:4-7.) Towers was responsible for preparing the initial draft of the

§ 204(h) notice under Misthos's direction. (Trial Tr. Vol. IV, 641:20-22; Trial Tr. Vol. V,

896:19-21.) Misthos had prior experience drafting § 204(h) notices and she was familiar

with the § 204(h) notice requirements.(Trial Tr. vol. V, 896:12-18.) Misthos testified that

under her direction, several persons at Towers worked on preparing the § 204(h) notice,

including: a communications consultant, Jennifer Ngo, who prepared the initial internal

draft of the Notice; actuary Markson, who worked with Ngo to update several internal

drafts of the Notice; actuaries, Rosalind Preiss and David Fee, who provided the

numerical examples; an editor, Faye Dixon, who reviewed and made comments on the

drafts; and a newly hired associate. (Trial Tr. vol. V, 872:22-873:4, 896:8-899:21; Trial

Tr. vol. VI, 945:9-21.) In addition, Misthos coordinated the notice preparation and

conducted the final review before sending to the client "to make sure that [she] thought it

was compliant with the 204(h) regulations." (Trial Tr. vol. V, 899:14-21.)

42. In addition to hiring Towers for its expertise, Egbert and Allen retained

Schlaefer, an attorney with Pillsbury, who had expertise in ERISA, benefits, and tax law,

to review the § 204(h) notice and provide edits to ensure legal compliance. (Trial Tr. vol.

II, 276:1-16; Trial Tr. vol. VI, 1065:3-7.)

43. Solvay's choice to engage Towers and Pillsbury for help with its § 204(h)

notice is consistent with the testimony Claude Poulin, Employees' actuarial expert, who

admitted on cross-examination that an average person who is not a lawyer or actuary

would have difficulty understanding the § 204(h) regulations. (Trial Tr. vol. II, 156:4-10.)

21

**JA-21**

Solvay's choice to seek advice from both expert lawyers and actuaries is evidence of its intent to comply with the § 204(h) requirements.

44.  As part of the § 204(h) notice preparation process, Allen and his team, Towers, and Pillsbury formulated several drafts of the § 204(h) notice. (See Trial Tr. vol. IV, 715:6-741:10; Trial Tr. vol. V, 747:15-754:18.)

45. On September 2, 2004, Misthos forwarded the initial draft of the § 204(h) notice to Allen, who managed the day-to-day responsibilities regarding the preparation of the § 204(h) notice. (Trial Tr. vol. V, 901:15-17, 908:22-23; Ex. S3.) Misthos testified that Solvay communicated to her that its intent with regard to the § 204(h) notice was to "fully comply with the rules." (Trial Tr. vol. VI, 924:24-925:1.) Misthos further testified that she reviewed it for compliance, knowing that counsel would conduct a legal review. (Trial Tr. vol. V, 896:4-11, 899:14-21.)

46. After receiving the draft notice, Allen forwarded it to Schlaefer for "legal review." (Trial Tr. vol. VI, 1066:8-13; Ex. T3.)

47. Schlaefer, who has reviewed a number of draft § 204(h) notices in her career, actively referenced the ERISA statute and the applicable regulations' requirements for § 204(h) notices during her review of the initial draft notice. (Trial Tr. vol. VI, 1065:8-10, 1094:15-21.) Schlaefer proposed several edits within a redline version of the draft notice

22

**JA-22**

based on compliance with the § 204(h) regulations, including several additions regarding

early retirement "subsidies." (Trial Tr. vol. VI, 1069:4-1072:21, 1097:23-1098:7; Ex.

19.)[1]

48. Schlaefer testified that her comments to the notice were intended to make it

"compliant with the regulation" and the intent behind all "the changes [was] to comply

with the requirements of the 204(h) notice." (Trial Tr. vol. VII, 1135:4-7, 1172:23-

1173:1; *see also* Ex. B4 (noting that edits were "based on compliance with 204(h)

regulations").) Schlaefer also testified that she knew that the "204(h) notice requires that

you draft it in a way that is calculated to be understood by the average plan participant, so

I had that in mind when I provided comments and tried to spot issues." (Trial Tr. vol. VII,

1151:14-19.) She also testified that "I think both the actuaries and the lawyers focus on

that, on the requirement of the regulations to make it clearly understandable." (Trial Tr.

---

[1] Employees adduced countless pieces of testimony concerning Solvay's use of the words subsidy and subsidies. (*E.g.* Trial Tr. vol. II, 311:2-312:3; Trial Tr. vol. IV, 621:16-23; Trial Tr. vol. VI, 1111:23-1114:5, 1123:2-1124:14; Trial Tr. vol. VII, 1148:3-1151-7.) However, that testimony is not relevant to Solvay's intent concerning its failure to describe how to calculate early-retirement benefits. While numerous employees, including the CFO could not clearly define their meaning in the context of the § 204(h) notice, Employees provided no evidence that Solvay intentionally included that language in order to confuse or mislead the participants about how to calculate their benefits.

23

**JA-23**

vol. VI, 1091:6-8.)[2]

49. Allen and his team accepted each of Schlaefer's recommendations, including

the recommendations regarding the early retirement subsidy information. (Trial Tr. vol.

IV, 722:20-723:20; Trial Tr. vol. V, 750:24-751:4; Ex. 21.)

50. Towers and Pillsbury continued to review and edit the draft § 204(h) notice

and both approved the final § 204(h) notice. (Trial Tr. Vol. VI, 924:5-12, 997:8-12,

1074:10-1075:9, 1076:4-7; Trial Tr. Vol. VII, 1175:2-25; Ex. 23.) Towers and Pillsbury

also reviewed several other communication documents including the "Future Choice

Brochure," which in combination with the § 204(h) notice, acted as the SMM. (Trial Tr.

vol. V, 891:24-892:3; Trial Tr. vol. VII, 1181:9-19, 1182:17-19.)

51. At no time did Solvay reject any recommendation from Pillsbury or Towers

regarding early-retirement benefits information in the § 204(h) notice. (Trial Tr. vol. III,

397:7-15; Trial Tr. Vol. IV, 723:17-20; Trial Tr. vol. V, 750:24-751:4.) Both Allen and

Egbert testified that throughout the drafting process they did not intentionally omit any

information regarding early-retirement benefits from the § 204(h) notice and that they

believed at the time of distribution that the notice complied with the law. (Trial Tr. vol. II,

---

[2] The Court uses the testimony to determine only Solvay's intent, not whether a violation
occurred. The Tenth Circuit ruled that the § 204(h) notice did not, in fact, comply with the
regulations. *Jensen*, 625 F.3d at 654-55.

333:6-15, 336:11-23; Trial Tr. vol. III, 397:21-23, 406:24-408:3, 457:9-11; Trial Tr. vol.

IV, 618:14-16, 620:17-19; Trial Tr. vol. V, 755:3-9.)

52. Likewise, Misthos testified that she did not intentionally omit any information

from the § 204(h) notice regarding early-retirement benefits, and that no one instructed

her to omit any such information. (Trial Tr. Vol. VI, 923:18-924:12.) Schlaefer also

testified that no one instructed her to omit or delete any information related to early-

retirement subsidies. (Trial Tr. vol. VI, 1076:8-11.) Employees have failed to adduce any

evidence that contradicts this testimony.

53. The Court notes that none of the testimony adduced by Employees provides

any evidence of Solvay's intent with respect to the § 204(h) notice, with the single

exception of testimony of Maxfield. Maxfield admitted on cross-examination, "It is my

opinion that none of those people [referring to Egbert, Allen, and Harding] would

intentionally do anything to not comply with the law." (Trial Tr. vol. II, 268:5-12.)

Because Maxfield was an adverse witness to Solvay as his future pension benefits were

reduced as a result of the conversion, the Court finds Maxfield's testimony credible.

Moreover, Maxfield's testimony is consistent with the other evidence. Solvay did not

intentionally fail to describe how early-retirement benefits were calculated before and

after the conversion.

25

**JA-25**

54. Therefore, based on the credible testimony of Allen, Egbert, Misthos, Schlaefer, and Maxfield, the Court finds that Solvay's intent was to provide a compliant § 204(h) notice to participants. The Court further finds that Solvay did not intentionally omit information regarding how to calculate early-retirement benefits from the § 204(h) notice.

*Distribution of the § 204(h) Notice*

55. The § 204(h) notice, along with additional communications, were mailed to participants on September 17, 2004. (Stip. at 3; Ex. 27.) The communication materials distributed to non-grandfather eligible participants included: (1) the § 204(h) notice; (2) a FutureChoice Brochure; and (3) a Personalized Statement of Estimated Opening Account Balances. (Stip. at 3-4; Ex. 28; Ex. 27; Ex. C5.) Grandfather eligible participants who needed to make a decision about which formula to choose received a slightly different communications packet that contained more information about their options, including: (1) the 204(h) notice; (2) a FutureChoice Brochure; (3) a Personalized Statement of Projected Retirement Benefits (with information under "Option 85," as applicable); (4) the FutureChoice Decision Guide (which included information about "Option 85"); and (5) a Pension Plan Election Form. (Trial Tr. vol. IV, 740:8-23; Trial Tr. vol. V, 747:15-748:16; Ex. 27; Ex. 28; Ex. Y4; Ex. A5 at ESOLVAY000226; Ex. Z4.)

26

**JA-26**

56. After the distribution of the § 204(h) notice and other communication materials, in September and October 2004, Allen and other Solvay representatives presented the Pension Plan and Savings Plan changes to participants in live, on-site meetings using a PowerPoint presentation. (Trial Tr. vol. IV, 605:15-606:11; Trial Tr. vol. V, 766:3-11; Ex. 29; Ex. 30.)

57. While the PowerPoint presentation included a statement that the "Rule of 85/early retirement features remain in the [old] pension plan," that statement was made only on the slide explaining grandfathering. Nowhere else does the presentation state that early-retirement benefits are protected. (Ex. 29.)

58. One of the employee meetings Allen conducted was recorded and portions from the recorded meeting were played at trial. (Trial Tr. vol. IV, 576:12-15, 660:7-11.) The Court finds credible Allen's statement that while each meeting utilized the same PowerPoint presentation as a guide, the content of each meeting varied with the audience. (Trial Tr. vol. IV, 612:6-10, 615:9-11.) During the presentation, Allen encouraged employees to ask questions about the conversion. (Ex. 40 at 3:16-4:4.)

59. Jensen and Maxfield testified that throughout this communication process surrounding the conversion, Maxfield and Sherrie Frolic, the human resources representatives at Solvay Chemicals in Green River, made themselves available and

27

**JA-27**

maintained an open-door policy in which employees could ask questions and seek clarification. (Trial Tr. vol. I, 72:19-73:16; Trial Tr. vol. II, 251:17-254:8, 265:8-266:5.) Specifically, Maxfield testified that he answered questions to the best of his ability and instructed his team members "to help each and every employee the best that they could every day, to not give answers that they didn't know to be accurate, and to take Solvay America up on the invitation to call and refer questions to them and that they would help us through this process." (Trial Tr. vol. II, 251:17-252:1.)

60. Further, there was evidence presented that Egbert asked that the various presidents and senior human resources representatives encourage their employees "to attend the meetings to ensure that they fully understand [the conversion]." (Ex. H5.)

61. The Court finds that Solvay's communication efforts in the on-site meetings and through their human resources representatives undercut Employees' allegations that Solvay intended to not disclose information regarding the changes associated with the conversion.

62. Further, the testimony at trial established that participants understood the impact of the conversion. Specifically, Jensen, Godwin, Liscomb, and Goff, understood and were upset about the elimination of early retirement subsidies, and in particular the elimination of the Rule of 85 from the new plan. (Trial Tr. vol. I, 58:8-11, 69:1-11,

28

**JA-28**

72:11-15; 109:15-16; Trial Tr. vol. III, 475:8-13, 518:22-24, 537:2-4; Trial Tr. vol. V,

857:12-15.) Additionally, Jensen and Goff testified that they understood that they would

be losing a substantial amount of money as a result of the conversion. (Trial Tr. vol. I,

71:14-72:18, 76:9-25; Trial Tr. vol. III, 547:24-548:15.)

     63. Moreover, even Employees' witnesses that do not remember reading the

§ 204(h) notice understood the effect of the conversion. Christensen and Mulinix both

testified that they did not remember reading the § 204(h) notice. (Trial Tr. vol. II,

203:8-9; Trial Tr. vol. III, 489:4-14.) Yet, Christensen testified that she knew that her

benefits under the new plan would not come close to the benefits she would have had

under the old plan. (Trial Tr. vol. II, 204:1-15.) Likewise, Mulinix testified that she

understood that she was losing money as a result of the conversion. (Trial Tr. vol. III,

487:11-14.)

     64. Employees failed to introduce evidence sufficient to establish why Solvay

would communicate the loss of the Rule of 85 and the significant loss of pension plan

benefits, yet intentionally omit information from the § 204(h) notice regarding how to

calculate early-retirement subsidies. Similarly, Employees failed to establish that Solvay

intentionally failed to disclose to participants that they could "grow into" Rule of 85

benefits.

65. Jensen and Goff further testified that because of the changes to the pension plan, the loss of the Rule of 85, and the other reductions to benefits, employees at the Green River location organized a union campaign. (Trial Tr. vol. I, 73:17-74:5; Trial Tr. vol. III, 544:6-23.) The Court finds that this testimony establishes that the § 204(h) notice (while legally deficient in the one aspect held by the Tenth Circuit) and Solvay's various other communications actually informed the participants of the changes to the pension plan. That Solvay communicated this information also establishes that Solvay had no intent to mislead or conceal information from the participants.

66. Moreover, whether or not Employees claim to have understood the notice at the time, the testimony of Employees and other class members establishes that they were able to utilize the tables in the § 204(h) notice and could determine their individual loss of benefits. For example, when questioned, Goff was able to utilize the tables found in the § 204(h) notice to closely align his age and years of service and determine his early-retirement benefits before and after the conversion. (Trial Tr. vol. III, 538:7-540:21.) Jensen was also able to determine his early-retirement benefits before and after the conversion by simply looking at the § 204(h) notice's Table B. (Trial Tr. vol. I, 71:1-22.) Similarly, Employees' witness Saganich was able to refer to Table B in the § 204(h) notice at trial and determine that at age 55 she would have been entitled to approximately

30

**JA-30**

$3,700 under the old plan and $1,100 under the new plan. (Trial Tr. vol. V, 856:9-858:15.) Saganich testified that the disparity demonstrates that she was losing approximately two-thirds of the value of her early-retirement benefits. (Trial Tr. vol. V, 856:9-858:15.) This information is the same as the calculation Saganich performed in 2004 when she emailed Harding asking for consideration for increased benefits. (Ex. 35; Trial Tr. vol. V, 849:14-850:22, 856:9-857:6, 858:4-9.)

67. Because the employees understood the impact of the conversion on their benefits, the Court finds that Solvay did not, in fact, mislead participants. Based on all the evidence, the Court finds that Solvay intended to fully communicate the benefit changes. The Court therefore finds that Solvay did not intentionally omit any required information from the § 204(h) notice.

*Feedback After § 204(h) Notice*

68. After Solvay communicated the conversion to employees, Egbert, Allen, and others received emails from participants expressing their displeasure with the changes. Both Saganich and Godwin testified that they were upset about the reduction of their anticipated benefits. (Trial Tr. vol. I, 97:9-15; Trial Tr. vol. V, 851:1-11, 858:10-14.) Saganich and Godwin each sent emails to Harding expressing their dissatisfaction with the conversion. (Ex. 35; Ex. 53.) Saganich's email noted that she would be receiving

31

**JA-31**

about two-thirds less under the new plan. (Ex. 35.)  In Godwin's email, she stated that, as

a result of the conversion, she estimated that she was going to lose between

$650,000-$800,000. (Ex. 53.)

69. Godwin's email also requested an exception so that she be allowed to

grandfather into the old plan and requested an individualized projection of benefits under

both plan at age 59½. (Trial Tr. vol. I, 105:13-23, 106:18-107:3, 109:3-20; Ex. 53.)

Similarly, employee Duncan Del-Toro sent Egbert an email to see if anything could be

done because his anticipated pension benefits under the new plan would be substantially

lower than those under the old plan. (Ex. 37.) Another employee, Kenneth Neugebauer,

also sent an email to Allen asking for a projection of benefits forecasting his future

annuity under the old plan as if it would continue to accrue after the conversion and his

future annuity under the new plan. (Ex. 37.)

70. Although these participants expressed their personal dissatisfaction with the

reduction of their anticipated benefits and the eligibility cut-off criteria for

grandfathering, and requested side-by-side, individualized projections of benefits under

both plans, none of their communications alleged the § 204(h) notice was deficient. (Ex.

35; Ex. 37; Ex. 53.) There is no evidence that any employee challenged the adequacy of

the § 204(h) notice until the administrative claim was filed.

32

**JA-32**

Case 2:06-cv-00273-ABJ Document 216 Filed 10/11/11 Page 33 of 43
Appellate Case: 11-8092 Document: 01018787120 Date Filed: 01/31/2012 Page: 106

71. The evidence reflects only one employee communication that mentions the
§ 204(h) notice. (Ex. 52.) That communication was sent from attorney Nancy Wasch on
behalf of an employee, Darrin Meyer. (*Id.*; Trial Tr. vol. V, 767:20-768:16.) While
Wasch's email originally challenged the adequacy of the notice, (Ex. E7), Solvay pointed
out the information was located on the § 204(h) notice and FutureChoice brochure. Based
on that response, Wasch was able to determine that "Mr. Meyer's monthly annuity,
approximately $849 for life beginning at age 65, is preserved." (Ex. G7.) After Solvay
responded to Wasch's email, there were no further questions that even mentioned the §
204(h) notice that would have put Solvay on notice of its failure.

72. Even so, after receiving the communications from participants, Egbert and
Allen consulted Schlaefer for advice. (Ex. 37.) Schlaefer advised Solvay that despite the
participants' requests, Solvay was not legally required to provide participants with
individualized projections. (Trial Tr. vol. VII, 1184:13-23.) At no time, before or after the
employee communications, did Schlaefer or Pillsbury advise Solvay that the § 204(h)
notice was deficient in any respect. (Trial Tr. vol. VI, 1076:12-14.)

73. No evidence in the record indicates that Solvay ever discovered its
unintentional failure to describe how to calculate early-retirement benefits in its § 204(h)
notice. The evidence instead suggests that when confronted with the possibility that its §

33

**JA-33**

204(h) notice was deficient, Solvay sought the advice of its ERISA counsel to ensure it remained compliant.

### Conclusions of Law

74. Employees allege that Solvay's failure to describe in the § 204(h) how the early-retirement benefits were calculated under the old plan and the new plan was an egregious failure under 29 U.S.C. § 1054(h)(6)(B). The Court finds no egregious failure. Employees further allege Solvay violated 29 U.S.C. § 1022(a) by failing to follow ERISA's SMM requirements. This Court does not agree the SMM claim is properly before it. If the SMM claim is proper, Employees still failed to carry their burden on that claim. Therefore, Solvay is entitled to judgment in its favor.

75. ERISA § 204(h) defines an egregious failure to meet the notice requirements as follows:

> [T]here is an egregious failure to meet the requirements of this subsection if such failure is within the control of the plan sponsor and is
>
> (i) an intentional failure (including any failure to promptly provide the required notice or information after the plan administrator discovers an unintentional failure to meet the requirements of this subsection),
>
> (ii) a failure to provide most of the individuals with most of the information they are entitled to receive under this subsection, or
>
> (iii) a failure which is determined to be egregious under regulations

34

**JA-34**

prescribed by the Secretary of the Treasury.

29 U.S.C. § 1054(h)(6)(B).

76. The Court granted summary judgment to Solvay on subsection (ii), as there was no genuine issue of material fact that Solvay provided most of the information to most of the participants. (Doc. 165 at 5-6.) The Court also recognized that no argument exists on subsection (iii), as the regulations provide nothing more that the statute itself. (*Id.* at 5.) Therefore, the issue for trial was whether Solvay's failure was intentional or whether Solvay failed to promptly correct an unintentional failure after discovering the failure. (*Id.* at 12.)

*Intentional Failure*

77. Neither the statute nor the regulations define "intentional failure." *See* § 204(h); 26 C.F.R. § 54.4980F-l. While the term is undefined, this Court holds that proof of an intentional failure does not require proof of hostile or malicious intent. Courts have utilized the phrase in defining other terms. *E.g. Smith v. Wade*, 461 U.S. 30, 39 n.8 (1983) (willful neglect); *M.E.N. Co. v. Control Fludics, Inc.*, 834 F.2d 869,872-73 (10th Cir. 1987) (willful failure); *Brantner v. Poole*, 487 F.2d 1326,1328 (10th Cir. 1973) (willful misconduct); *NMP Corp. v. Parametric Tech. Corp.*, 958 F. Supp. 1536, 1546 (N.D. Okla. 1997) (gross negligence).

35

**JA-35**

78. In defining "willful failure," the Tenth Circuit has on numerous occasions explained, "intentional failure [is] distinguished from involuntary noncompliance. No wrongful intent need be shown." *M.E.N.*, 834 F.2d at 872-73 (*quoting In re Standard Metals Corp.*, 817 F.2d 625,628-29 (10th Cir. 1987)). This Court finds the Tenth Circuit definition to be in accordance with the plain meaning of the term. *See United States v. Floyd*, 88 F.3d 1517, 1523 (10th Cir. 1996) (applying ordinary meaning found in dictionary when Congress does not statutorily define a term). Black's Law Dictionary defines "intentional" as being "done with the aim of carrying out the act." (9th ed. 2009). Therefore, the meaning of intentional does not require maliciousness.

79. In civil and criminal cases alike, intent can be (and most often is) proved by circumstantial, rather than direct, evidence. *See United States v. King*, 632 F.3d 646,646 (10th Cir. 2011) ("The intent to possess the weapon to further the drug trafficking crime is generally proven through circumstantial evidence.") (*quoting United States v. Rogers*, 556 F.3d 1130, 1140 (10th Cir. 2009)); *United States v. Cardinas Garcia*, 596 F.3d 788, 798 (10th Cir. 2010) ("More often than not, intent is proved by circumstantial evidence."); *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1197 (10th Cir. 2008) ("Though [a plaintiff] lacks direct evidence of discriminatory intent, he still may carry his statutory burden by presenting circumstantial evidence . . . ."); *United States v. Johnson*,

36

**JA-36**

971 F.2d 562, 566 (10th Cir. 1992) ("Direct evidence of a defendant's intent is seldom available. Intent can be proven, however, from surrounding circumstances."); *SEC v. Curshen*, 2010 WL 1444910, *9 (10th Cir. Apr. 13,2010) ("[The defendant's] failure to disclose his self-interest is strong circumstantial evidence of intentional conduct.").

80.   While Employees agree that intent can be proved by circumstantial evidence, they argue that all they need to prove for an intentional failure is: (1) knowledge of statute's requirement, and (2) a failure to satisfy that requirement. Indeed, if intentional failure only required proof of those two elements, Employees would have carried their burden.

81. However, this Court holds as a matter of law that while those two facts are probative of an intentional failure, they are not determinative. Employees point to no law to support their proposition. Instead, this Court will follow the law stated above and consider those facts as circumstantial evidence of intent.

82. Employees argue that sufficient circumstantial evidence exists in the record for the Court to find Solvay committed an intentional failure. While that evidence was enough for this Court to find a genuine issue of material fact for trial, it was not enough to carry their burden at trial. At trial, Employees pointed to no other evidence that Solvay intentionally failed to provide the calculations of early-retirement benefits. To the

37

**JA-37**

contrary, the evidence showed that Solvay did its best to comply with the

regulations—the entire set of applicable regulations. What was proven at trial is that

Solvay consulted multiple experts on the complex issue of their plan conversion, all of

whom testified their goal (and Solvay's goal) was to comply with the law. Moreover, one

class member who had a working relationship with those employees making the ERISA

decisions stated that none of those employees "would intentionally do anything to not

comply with the law." (Trial Tr. vol. II, 268:11-12.)

83. Therefore, this Court holds that Employees failed to satisfy their burden of

proof; Solvay did not intentionally fail to disclose in the § 204(h) notice how to calculate

early-retirement benefits.

*Failure to Promptly Notice After Discovery*

84. Subsection (i) includes in its definition of an intentional failure "any failure to

promptly provide the required notice or information after the plan administrator discovers

an unintentional failure to meet the requirements of this subsection." § 1054(h)(6)(B)(i).

85. On summary judgment, this Court held a genuine issue of material fact existed

as to whether Solvay discovered its failure to describe how to calculate early-retirement

benefits in its § 204(h) notice. The Court recognized the genuine issue based on the

record indicating numerous employees requested side-by-side comparisons of the two

38

plans. Moreover, the Court noted that one email to Solvay included an employee's

attorney referencing some information that was not provided in the § 204(h) notice.

86. In the single case on point, *Brady v. Dow Chemical Co.*, the Fourth Circuit

held employees' emails indicating confusion over a certain issue was sufficient to find

that administrators had discovered a § 204(h) failure. 2009 WL 394322, *6 (4th Cir. Feb.

18, 2009). In *Brady*, the Fourth Circuit granted summary judgment for the plaintiff, as

emails clearly indicated multiple employees were confused over the specific deficiency of

the notice. Moreover, in that case emails also showed the plaintiff discussed with

administrators specifically how the § 204(h) notice was misleading concerning the same

failure the court held violated ERISA.

87. This case is distinguishable from *Brady*. The single email referencing a

deficiency of the § 204(h) notice was answered by Solvay by directing the attorney

making the inquiry to the first page of the § 204(h) notice. The attorney responded,

recognizing that the § 204(h) notice explained her client's accrued benefit was protected,

even referencing his annuity value. Therefore, that email does not suffice to put Solvay on

notice of its deficiency.

88. Moreover, the queries from the other employees similarly did not lead to a

discovery by Solvay of its failure. The majority of the inquiries discussed at trial

39

concerned the grandfather cutoff, and the employees most upset about the conversion knew they were losing significant benefits by the conversion. Nothing at trial indicated that any employees did not understand their benefits under the old plan, or that they would be losing the premier early-retirement benefits of the old plan. They were indeed most upset about losing those benefits.

89. The evidence at trial suggests the earliest time Solvay discovered its failure was after the filing of this case. This Court will not consider those facts.

90. Therefore, this Court holds that Employees failed to satisfy their burden of proof; Solvay did not discover its unintentional failure to disclose in the § 204(h) notice how to calculate early-retirement benefits.

*Claim Regarding SMM*

91. This Court entered its *Order on Mandate* (Doc. 149 at 1), stating:

On September 7, 2010, the Tenth Circuit Court of Appeals entered Judgment **affirming** the judgment of the district court with respect to Plaintiffs' ADEA claim and with respect to all of their ERISA claims and **reversing and remanding** as to the claim based on the failure of the § 204(h) notice to describe the calculation of early-retirement benefits. The mandate for the case issued October 26, 2010. Accordingly for the foregoing reasons, it is hereby

**ORDERED** that this matter be restored to the docket . . . .

92. Employees' argument that the remand includes more than the single issue

40

**JA-40**

listed in the Court's *Order on Mandate* stems from a statement made by the Tenth

Circuit:

> In sum, we hold that Solvay's SMM was not deficient, except for the possibility that § 1022(a) required disclosure of the old plan's method of calculating early-retirement benefits. We need not address that possible violation, however, because we have held that the failure to disclose violates [§ 204(h)], so remand is required in any event.

(Doc. 148 at 38.)

> 93. However, prior to that statement, the Tenth Circuit also stated:

> We are not convinced that the SMM was defective. With respect to Plaintiffs' first contention, aside from the failure to disclose how early-retirement benefits were calculated under the old plan, the SMM adequately described how the new plan differed from the old. And we need not decide whether that failure constituted an independent violation of [§ 102(a)], because we have already held that the failure violated [§ 204(h)]; and Plaintiffs have not suggested that any additional remedy would be available for a violation of [§ 102(a)].

(Doc. 148 at 35.)

> 94. Finally, this Court notes the Tenth Circuit's wording concerning Solvay's

failure:

> We therefore conclude that Solvay's notice failed to comply with the requirements for disclosure of early-retirement calculations. Whether Plaintiffs are entitled to relief, however, depends on whether there was an "egregious failure" in compliance. [§ 204(h)(6)(A)]. We remand to the district court to resolve that issue (although it may also consider any defense not addressed in this opinion that Solvay may have to this claim).

41

**JA-41**

(Doc. 148 at 31.)

95. This Court is not persuaded by Employees' argument that the Tenth Circuit's single choice of words indicating a possible § 102(a) violation overcomes the remainder of the Tenth Circuit's opinion mandating this Court only consider the single claim for the § 204(h) violation and whether relief is proper (whether the failure was egregious).

96. Even if the Tenth Circuit had remanded this case to this Court to consider more than the single issue of the § 204(h) violation, Employees would still not be entitled to equitable relief under § 502(a)(3) by simply proving a violation of § 102(a). *Ackerman v. Warnaco, Inc.*, 55 F.3d 117, 124–25 (3d Cir. 1995) ("[T]he plaintiff [must] demonstrate the presence of 'extraordinary circumstances.' Such circumstances include situations where the employer has acted in bad faith, or has actively concealed a change in the benefit plan, and the covered employees have been substantively harmed by virtue of the employer's actions.") (*quoted in Engers v. AT&T, Inc.*, 2011 WL 2507089, *4 (3d Cir. June 22, 2011)).

97. Employees presented no evidence at trial of such "extraordinary circumstances." The record shows that Solvay's failure to disclose the calculations for early-retirement benefits was not in bad faith, that Employees knew they were losing the benefits with the plan conversion, and they were not substantively harmed by Solvay's

42

**JA-42**

failure to properly disclose. Therefore relief under § 502(a)(3) for a § 102(a) would not be proper in this case.

Dated this __10th__ day of ~~September~~ October, 2011.

Alan B. Johnson
United States District Judge

43

**JA-43**

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

OCT 11 2011

Stephan Harris, Clerk
Cheyenne

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| WADE JENSEN and DONALD D. GOFF, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SOLVAY CHEMICALS, INC., SOLVAY AMERICA, INC., and SOLVAY AMERICA COMPANIES PENSION PLAN,<br><br>Defendants. | Case No. 06-CV-273-J |

## FINAL JUDGMENT

The above-captioned matter came to trial before the Court without a jury, the Honorable Alan B. Johnson, United States District Judge, presiding. The issues were duly tried from July 11, 2011 through July 18, 2011. The Court entered its *Findings of Fact and Conclusions of Law* (Doc. 216), finding that Plaintiffs did not satisfy their burden on each of their claims remaining on remand.

Therefore, it is ORDERED, ADJUDGED, and DECREED that Plaintiffs Wade Jensen and Donald D. Goff, individually and on behalf of all others similarly situated, recover nothing from Defendants Solvay Chemicals, Inc., Solvay America, Inc., and Solvay America Companies Pension Plan.

**JA-44**

Moreover, it is ORDERED, ADJUDGED, and DECREED that Defendants Solvay Chemicals, Inc., Solvay America, Inc., and Solvay America Companies Pension Plan recover from Plaintiffs Wade Jensen and Donald D. Goff, individually and on behalf of all others similarly situated, their costs pursuant to Fed. R. Civ. P. 54 and U.S.D.C.L.R. 54.2. The parties shall bear their own attorney's fees.

Dated this _10th_ day of ~~September~~ *October*, 2011.

Alan B. Johnson
United States District Judge

**JA-45**

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

OCT 28 2010

Stephan Harris, Clerk
Cheyenne

# United States District Court
### For The District of Wyoming

WADE JENSEN; DONALD D GOFF,
individually and on behalf of all others
similarly situated,

        Plaintiff(s),

vs.

SOLVAY CHEMICALS, INC.; SOLVAY
AMERICA, INC.; SOLVAY AMERICA
COMPANIES PENSION PLAN,

        Defendant(s).

Case No. 2:06-cv-00273-ABJ

## ORDER ON MANDATE

On September 7, 2010, the Tenth Circuit Court of Appeals entered Judgment **affirming** the judgment of the district court with respect to Plaintiffs' ADEA claim and with respect to all of their ERISA claims and **reversing and remanding** as to the claim based on the failure of the § 204(h) notice to describe the calculation of early-retirement benefits. The mandate for the case issued October 26, 2010. Accordingly for the foregoing reasons, it is hereby

**ORDERED** that this matter be restored to the docket and that a scheduling conference be held in this matter forthwith, to be set by separate order at a later date.

Dated this _27_ᵗʰ day of _October_ 2010.

ALAN B. JOHNSON
UNITED STATES DISTRICT COURT

**JA-85**

## Relevant Statutes and Regulations

1.    ERISA §102, 29 U.S.C. §1022.

2.    ERISA §204(h), 29 U.S.C. §1054(h).

3.    ERISA §502(a)(3), 29 U.S.C. §1132(a)(3).

4.    Excerpts of 26 C.F.R. 54.4980F-1.

5.    Excerpts of 29 C.F.R. 2520.102-2.

6.    29 C.F.R. 2520.104b-3(a).



29 U.S.C.A. § 1022

**Effective: April 1, 2009**

United States Code Annotated Currentness
Title 29. Labor
Chapter 18. Employee Retirement Income Security Program (Refs & Annos)
Subchapter I. Protection of Employee Benefit Rights (Refs & Annos)
Subtitle B. Regulatory Provisions
Part 1. Reporting and Disclosure
➡ § 1022. Summary plan description

**(a)** A summary plan description of any employee benefit plan shall be furnished to participants and beneficiaries as provided in section 1024(b) of this title. The summary plan description shall include the information described in subsection (b) of this section, shall be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan. A summary of any material modification in the terms of the plan and any change in the information required under subsection (b) of this section shall be written in a manner calculated to be understood by the average plan participant and shall be furnished in accordance with section 1024(b)(1) of this title.

**(b)** The summary plan description shall contain the following information: The name and type of administration of the plan; in the case of a group health plan (as defined in section 1191b(a)(1) of this title), whether a health insurance issuer (as defined in section 1191b(b)(2) of this title) is responsible for the financing or administration (including payment of claims) of the plan and (if so) the name and address of such issuer; the name and address of the person designated as agent for the service of legal process, if such person is not the administrator; the name and address of the administrator; names, titles, and addresses of any trustee or trustees (if they are persons different from the administrator); a description of the relevant provisions of any applicable collective bargaining agreement; the plan's requirements respecting eligibility for participation and benefits; a description of the provisions providing for nonforfeitable pension benefits; circumstances which may result in disqualification, ineligibility, or denial or loss of benefits; the source of financing of the plan and the identity of any organization through which benefits are provided; the date of the end of the plan year and whether the records of the plan are kept on a calendar, policy, or fiscal year basis; the procedures to be followed in presenting claims for benefits under the plan including the office at the Department of Labor through which participants and beneficiaries may seek assistance or information regarding their rights under this chapter and the Health Insurance Portability and Accountability Act of 1996 with respect to health benefits that are offered through a group health plan (as defined in section 1191b(a)(1) of this title), the remedies available under the plan for the redress of claims which are denied in whole or in part (including procedures required under section 1133 of this title), and if the employer so elects for purposes of complying with section 1181(f)(3)(B)(i) of this title, the model notice applicable to the State in which the participants and beneficiaries reside.



29 U.S.C.A. § 1054

**Effective:[See Notes]**

United States Code Annotated [Currentness](#)
Title 29. Labor
Chapter 18. Employee Retirement Income Security Program [(Refs & Annos)](#)
Subchapter I. Protection of Employee Benefit Rights [(Refs & Annos)](#)
[Subtitle B](#). Regulatory Provisions
[Part 2](#). Participation and Vesting [(Refs & Annos)](#)
➡ **§ 1054. Benefit accrual requirements**

. . .

(h) Notice of significant reduction in benefit accruals

**(1)** An applicable pension plan may not be amended so as to provide for a significant reduction in the rate of future benefit accrual unless the plan administrator provides the notice described in paragraph (2) to each applicable individual (and to each employee organization representing applicable individuals) and to each employer who has an obligation to contribute to the plan.

**(2)** The notice required by paragraph (1) shall be written in a manner calculated to be understood by the average plan participant and shall provide sufficient information (as determined in accordance with regulations prescribed by the Secretary of the treasury) to allow applicable individuals to understand the effect of the plan amendment. the Secretary of the treasury may provide a simplified form of notice for, or exempt from any notice requirement, a plan

**(A)** which has fewer than 100 participants who have accrued a benefit under the plan, or

**(B)** which offers participants the option to choose between the new benefit formula and the old benefit formula.

**(3)** Except as provided in regulations prescribed by the Secretary of the Treasury, the notice required by paragraph (1) shall be provided within a reasonable time before the effective date of the plan amendment.

**(4)** Any notice under paragraph (1) may be provided to a person designated, in writing, by the person to which it would otherwise be provided.

**(5)** A plan shall not be treated as failing to meet the requirements of paragraph (1) merely because notice is provided before the adoption of the plan amendment if no material modification of the amendment occurs before the amendment is adopted.

**(6)(A)** In the case of any egregious failure to meet any requirement of this subsection with respect to any plan amendment, the provisions of the applicable pension plan shall be applied as if such plan amendment entitled all applicable individuals to the greater of

**(i)** the benefits to which they would have been entitled without regard to such amendment, or

**(ii)** the benefits under the plan with regard to such amendment.

**(B)** For purposes of subparagraph (A), there is an egregious failure to meet the requirements of this subsection if such failure is within the control of the plan sponsor and is

**(i)** an intentional failure (including any failure to promptly provide the required notice or information after the plan administrator discovers an unintentional failure to meet the requirements of this subsection),

**(ii)** a failure to provide most of the individuals with most of the information they are entitled to receive under this subsection, or

**(iii)** a failure which is determined to be egregious under regulations prescribed by the Secretary of the Treasury.

**(7)** The Secretary of the Treasury may by regulations allow any notice under this subsection to be provided by using new technologies.

**(8)** For purposes of this subsection

**(A)** The term "applicable individual" means, with respect to any plan amendment--

**(i)** each participant in the plan; and

**(ii)** any beneficiary who is an alternate payee (within the meaning of section 1056(d)(3)(K) of this title) under an applicable qualified domestic relations order (within the meaning of section 1056(d)(3)(B)(i) of this title),

whose rate of future benefit accrual under the plan may reasonably be expected to be significantly reduced by such plan amendment.

**(B)** The term "applicable pension plan" means--

**(i)** any defined benefit plan; or

**(ii)** an individual account plan which is subject to the funding standards of section 412 of Title 26.

**(9)** For purposes of this subsection, a plan amendment which eliminates or reduces any early retirement benefit or retirement-type subsidy (within the meaning of subsection (g)(2)(A)) shall be treated as having the effect of reducing the rate of future benefit accrual.



29 U.S.C.A. § 1132



**Effective: April 1, 2009**

United States Code Annotated Currentness
Title 29. Labor
Chapter 18. Employee Retirement Income Security Program (Refs & Annos)
Subchapter I. Protection of Employee Benefit Rights (Refs & Annos)
⌐▣Subtitle B. Regulatory Provisions
⌐▣Part 5. Administration and Enforcement
➡➡ **§ 1132. Civil enforcement**

(a) Persons empowered to bring a civil action

A civil action may be brought--

. . .

**(3)** by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan;



Treas. Reg. § 54.4980F-1
26 C.F.R. § 54.4980F-1

**C**

Code of Federal Regulations Currentness
Title 26. Internal Revenue
Chapter I. Internal Revenue Service, Department of the Treasury
  Subchapter D. Miscellaneous Excise Taxes
  Part 54. Pension Excise Taxes (Refs & Annos)

**➡ § 54.4980F-1 Notice requirements for certain pension plan amendments significantly reducing the rate of future benefit accrual.**

The following questions and answers concern the notification requirements imposed by 4980F of the Internal Revenue Code and section 204(h) of ERISA relating to a plan amendment of an applicable pension plan that significantly reduces the rate of future benefit accrual or that eliminates or significantly reduces an early retirement benefit or retirement-type subsidy.

. . .

**Questions and Answers**

. . .

Q-11. What information is required to be provided in a section 204(h) notice?

A-11. (a) Explanation of notice requirements--(1) In general. Section 204(h) notice must include sufficient information to allow applicable individuals to understand the effect of the plan amendment. In order to satisfy this rule, a plan administrator providing section 204(h) notice must satisfy each of the following requirements of this paragraph (a).

(2) Information in section 204(h) notice. The information in a section 204(h) notice must be written in a manner calculated to be understood by the average plan participant and to apprise the applicable individual of the significance of the notice.

(3) Required narrative description of amendment--(i) Reduction in rate of future benefit accrual. In the case of an amendment reducing the rate of future benefit accrual, the notice must include a description of the benefit or allocation formula prior to the amendment, a description of the benefit or allocation formula under the plan as amended, and the effective date of the amendment.

(ii) Reduction in early retirement benefit or retirement-type subsidy. In the case of an amendment that reduces an early retirement benefit or retirement-type subsidy (other than as a result of an amendment reducing the rate of future benefit accrual), the notice must describe how the early retirement benefit or retirement-type subsidy is calculated from the accrued benefit before the amendment, how the early retirement benefit or retirement-type subsidy is calculated from the accrued benefit after the amendment, and the effective date of the amendment. For example, if, for a plan with a normal retirement age of 65, the change is from an unreduced normal retirement benefit at age 55 to an unreduced normal retirement benefit at age 60 for benefits accrued in the future, with an actuarial reduction to apply for benefits accrued in the future to the extent that the early retirement benefit begins before age 60, the notice must state the change and specify the factors that apply in calculating the actuarial reduction (for example, a 5% per year reduction applies for early retirement before age 60).

(4) Sufficient information to determine the approximate magnitude of reduction--(i) General rule. (A) Section 204(h) notice must include sufficient information for each applicable individual to determine the approximate magnitude of the expected reduction for that individual. Thus, in any case in which it is not reasonable to expect that the approximate magnitude of the reduction for each applicable individual will be reasonably apparent from the description of the amendment provided in accordance with paragraph (a)(3) of this Q&A-11, further information is required. The further information may be provided by furnishing additional narrative information or in other information that satisfies this paragraph of this section.

(B) To the extent any expected reduction is not uniformly applicable to all participants, the notice must either identify the general classes of participants to whom the reduction is expected to apply, or by some other method include sufficient information to allow each applicable individual receiving the notice to determine which reductions are expected to apply to that individual.

(ii) Illustrative examples--(A) Requirement generally. The requirement to include sufficient information for each applicable individual to determine the approximate magnitude of the expected reduction for that individual under (a)(4)(i)(A) of this Q&A-11 is deemed satisfied if the notice includes one or more illustrative examples showing the approximate magnitude of the reduction in the examples, as provided in this paragraph (a)(4)(ii). Illustrative examples are in any event required to be provided for any change from a traditional defined benefit formula to a cash balance formula or a change that results in a period of time during which there are no accruals (or minimal accruals) with regard to normal retirement benefits or an early retirement subsidy (a wear-away period).

(B) Examples must bound the range of reductions. Where an amendment results in reductions that vary (either among participants, as would occur for an amendment converting a traditional defined benefit formula to a cash balance formula, or over time as to any individual participant, as would occur for an amendment that results in a wear-away period), the illustrative example(s) provided in accordance with this paragraph (a)(4)(ii) must show the approximate range of the reductions. However, any reductions that are likely to occur in only a de minimis number of cases are not required to be taken into account in determining the range of the reductions if a narrative statement is included to that effect and examples are provided that show the approximate range of the reductions in other cases. Amendments for which the maximum reduction occurs under identifiable circumstances, with proportionately smaller reductions in other cases, may be illustrated by one example illustrating the maximum reduction, with a statement that smaller reductions also occur. Further, assuming that the reduction varies from small to large depending on service or other factors, two illustrative examples may be provided showing the smallest likely reduction and the largest likely reduction.

(C) Assumptions used in examples. The examples provided under this paragraph (a)(4)(ii) are not required to be based on any particular form of payment (such as a life annuity or a single sum), but may be based on whatever form

appropriately illustrates the reduction. The examples generally may be based on any reasonable assumptions (for example, assumptions relating to the representative participant's age, years of service, and compensation, along with any interest rate and mortality table used in the illustrations, as well as salary scale assumptions used in the illustrations for amendments that alter the compensation taken into account under the plan), but the section 204(h) notice must identify those assumptions. However, if a plan's benefit provisions include a factor that varies over time (such as a variable interest rate), the determination of whether an amendment is reasonably expected to result in a wear-away period must be based on the value of the factor applicable under the plan at a time that is reasonably close to the date section 204(h) notice is provided, and any wear-away period that is solely a result of a future change in the variable factor may be disregarded. For example, to determine whether a wear-away occurs as a result of a section 204(h) amendment that converts a defined benefit plan to a cash balance pension plan that will credit interest based on a variable interest factor specified in the plan, the future interest credits must be projected based on the interest rate applicable under the variable factor at the time section 204(h) notice is provided.

(D) Individual statements. This paragraph (a)(4)(ii) may be satisfied by providing a statement to each applicable individual projecting what that individual's future benefits are reasonably expected to be at various future dates and what that individual's future benefits would have been under the terms of the plan as in effect before the section 204(h) amendment, provided that the statement includes the same information required for examples under paragraphs (a)(4)(ii)(A) through (C) of this Q&A-11, including showing the approximate range of the reductions for the individual if the reductions vary over time and identification of the assumptions used in the projections.

(5) No false or misleading information. A section 204(h) notice may not include materially false or misleading information (or omit information so as to cause the information provided to be misleading).

(6) Additional information when reduction not uniform--(i) In general. If an amendment by its terms affects different classes of participants differently (e.g., one new benefit formula will apply to Division A and another to Division B), then the requirements of paragraph (a) of this Q&A-11 apply separately with respect to each such general class of participants. In addition, the notice must include sufficient information to enable an applicable individual who is a participant to understand which class he or she is a member of.

(ii) Option for different section 204(h) notices. If a section 204(h) amendment affects different classes of applicable individuals differently, the plan administrator may provide to differently affected classes of applicable individuals a section 204(h) notice appropriate to those individuals. Such section 204(h) notice may omit information that does not apply to the applicable individuals to whom it is furnished, but must identify the class or classes of applicable individuals to whom it is provided.

(b) Examples. The following examples illustrate the requirements paragraph (a) of this Q&A-11. In each example, it is assumed that the actual notice provided is written in a manner calculated to be understood by the average plan participant and to apprise the applicable individual of the significance of the notice in accordance with paragraph (a)(2) of this Q&A-11. The examples are as follows:

**Example 1.** (i) Facts. Plan A provides that a participant is entitled to a normal retirement benefit of 2% of the participant's average pay over the 3 consecutive years for which the average is the highest (highest average pay) multiplied by years of service. Plan A is amended to provide that, effective January 1, 2004, the normal retirement benefit will be 2% of the participant's highest average pay multiplied by years of service before the effective date, plus 1% of the participant's highest average pay multiplied by years of service after the effective date. The plan administrator provides notice that states: "Under the Plan's current benefit formula, a participant's normal retirement benefit is 2% of the participant's average pay over the 3 consecutive years for which the average is the highest

multiplied by the participant's years of service. This formula is being changed by a plan amendment. Under the Plan as amended, a participant's normal retirement benefit will be the sum of 2% of the participant's average pay over the 3 consecutive years for which the average is the highest multiplied by years of service before the January 1, 2004 effective date, plus 1% of the participant's average pay over the 3 consecutive years for which the average is the highest multiplied by the participant's years of service after December 31, 2003. This change is effective on January 1, 2004." The notice does not contain any additional information.

(ii) Conclusion. The notice satisfies the requirements of paragraph (a) of this Q&A-11.

**Example 2.** (i) Facts. Plan B provides that a participant is entitled to a normal retirement benefit at age 64 of 2.2% of the participant's career average pay multiplied by years of service. Plan B is amended to cease all accruals, effective January 1, 2004. The plan administrator provides notice that includes a description of the old benefit formula, a statement that, after December 31, 2003, no participant will earn any further accruals, and the effective date of the amendment. The notice does not contain any additional information.

(ii) Conclusion. The notice satisfies the requirements of paragraph (a) of this Q&A-11.

**Example 3.** (i) Facts. Plan C provides that a participant is entitled to a normal retirement benefit at age 65 of 2% of career average compensation multiplied by years of service. Plan C is amended to provide that the normal retirement benefit will be 1% of average pay over the 3 consecutive years for which the average is the highest multiplied by years of service. The amendment only applies to accruals for years of service after the amendment, so that each employee's accrued benefit is equal to the sum of the benefit accrued as of the effective date of the amendment plus the accrued benefit equal to the new formula applied to years of service beginning on or after the effective date. The plan administrator provides notice that describes the old and new benefit formulas and also explains that for an individual whose compensation increases over the individual's career such that the individual's highest 3-year average exceeds the individual's career average, the reduction will be less or there may be no reduction. The notice does not contain any additional information.

(ii) Conclusion. The notice satisfies the requirements of paragraph (a) of this Q&A-11.

**Example 4.** (i) Facts. (A) Plan D is a defined benefit pension plan under which each participant accrues a normal retirement benefit, as a life annuity beginning at the normal retirement age of 65, equal to the participant's number of years of service multiplied by 1.5 percent multiplied by the participant's average pay over the 3 consecutive years for which the average is the highest. Plan D provides early retirement benefits for former employees beginning at or after age 55 in the form of an early retirement annuity that is actuarially equivalent to the normal retirement benefit, with the reduction for early commencement based on reasonable actuarial assumptions that are specified in Plan D. Plan D provides for the suspension of benefits of participants who continue in employment beyond normal retirement age, in accordance with section 203(a)(3)(B) of ERISA and regulations thereunder issued by the Department of Labor. The pension of a participant who retires after age 65 is calculated under the same normal retirement benefit formula, but is based on the participant's service credit and highest 3-year pay at the time of late retirement with any appropriate actuarial increases.

(B) Plan D is amended, effective July 1, 2005, to change the formula for all future accruals to a cash balance formula under which the opening account balance for each participant on July 1, 2005, is zero, hypothetical pay credits equal to 5 percent of pay are credited to the account thereafter, and hypothetical interest is credited monthly based on the applicable interest rate under section 417(e)(3) of the Internal Revenue Code at the beginning of the quarter. Any participant who terminates employment with vested benefits can receive an actuarially equivalent

annuity (based on the same reasonable actuarial assumptions that are specified in Plan D) commencing at any time after termination of employment and before the plan's normal retirement age of 65. The benefit resulting from the hypothetical account balance is in addition to the benefit accrued before July 1, 2005 (taking into account only service and highest 3-year pay before July 1, 2005), so that it is reasonably expected that no wear-away period will result from the amendment. The plan administrator expects that, as a general rule, depending on future pay increases and future interest rates, the rate of future benefit accrual after the conversion is higher for participants who accrue benefits before approximately age 50 and after approximately age 70, but is lower for participants who accrue benefits between approximately age 50 and age 70.

(C) The plan administrator of Plan D announces the conversion to a cash balance formula on May 16, 2005. The announcement is delivered to all participants and includes a written notice that describes the old formula, the new formula, and the effective date.

(D) In addition, the notice states that the Plan D formula before the conversion provided a normal retirement benefit equal to the product of a participant's number of years of service multiplied by 1.5 percent multiplied by the participant's average pay over the 3 years for which the average is the highest (highest 3-year pay). The notice includes an example showing the normal retirement benefit that will be accrued after June 30, 2005 for a participant who is age 49 with 10 years of service at the time of the conversion. The plan administrator reasonably believes that such a participant is representative of the participants whose rate of future benefit accrual will be reduced as a result of the amendment. The example estimates that, if the participant continues employment to age 65, the participant's normal retirement benefit for service from age 49 to age 65 will be $657 per month for life. The example assumes that the participant's pay is $50,000 at age 49. The example states that the estimated $657 monthly pension accrues over the 16-year period from age 49 to age 65 and that, based on assumed future pay increases, this amount annually would be 9.1 percent of the participant's highest 3-year pay at age 65, which over the 16 years from age 49 to age 65 averages 0.57 percent per year multiplied by the participant's highest 3-year pay. The example also states that the sum of the monthly annuity accrued before the conversion in the 10-year period from age 39 to age 49 plus the $657 monthly annuity estimated to be accrued over the 16-year period from age 49 to age 65 is $1,235 and that, based on assumed future increases in pay, this would be 17.1 percent of the participant's highest 3-year pay at age 65, which over the employee's career from age 39 to age 65 averages 0.66 percent per year multiplied by the participant's highest 3-year pay. The notice also includes two other examples with similar information, one of which is intended to show the circumstances in which a small reduction may occur and the other of which shows the largest reduction that the plan administrator thinks is likely to occur. The notice states that the estimates are based on the assumption that pay increases annually after June 30, 2005, at a 4 percent rate. The notice also specifies that the applicable interest rate under section 417(e) for hypothetical interest credits after June 30, 2005 is assumed to be 6 percent, which is the section 417(e) of the Internal Revenue Code applicable interest rate under the plan for 2005.

(ii) Conclusion. The information in the notice, as described in paragraph (i)(C) and (i)(D) of this Example 4, satisfies the requirements of paragraph (a)(3) of this Q&A-11 with respect to applicable individuals who are participants. The requirements of paragraph (a)(4) of this Q&A-11 are satisfied because, as noted in paragraph (i)(D) of this Example 4, the notice describes the old formula and describes the estimated future accruals under the new formula in terms that can be readily compared to the old formula, *i.e.*, the notice states that the estimated $657 monthly pension accrued over the 16-year period from age 49 to age 65 averages 0.57 percent of the participant's highest 3-year pay at age 65. The requirement in paragraph (a)(4)(ii) of this Q&A-11 that the examples include sufficient information to be able to determine the approximate magnitude of the reduction would also be satisfied if the notice instead directly stated the amount of the monthly pension that would have accrued over the 16-year period from age 49 to age 65 under the old formula.

**Example 5.** (i) Facts. The facts are the same as in Example 4, except that, under the plan as in effect before the amendment, the early retirement pension for a participant who terminates employment after age 55 with at least 20 years of service is equal to the normal retirement benefit without reduction from age 65 to age 62 and reduced by only 5 percent per year for each year before age 62. As a result, early retirement benefits for such a participant constitute a retirement-type subsidy. The plan as in effect after the amendment provides an early retirement benefit equal to the sum of the early retirement benefit payable under the plan as in effect before the amendment taking into account only service and highest 3-year pay before July 1, 2005, plus an early retirement annuity that is actuarially equivalent to the account balance for service after June 30, 2005. The notice provided by the plan administrator describes the old early retirement annuity, the new early retirement annuity, and the effective date. The notice includes an estimate of the early retirement annuity payable to the illustrated participant for service after the conversion if the participant were to retire at age 59 (which the plan administrator believes is a typical early retirement age) and elect to begin receiving an immediate early retirement annuity. The example states that the normal retirement benefit expected to be payable at age 65 as a result of service from age 49 to age 59 is $434 per month for life beginning at age 65 and that the early retirement annuity expected to be payable as a result of service from age 49 to age 59 is $270 per month for life beginning at age 59. The example states that the monthly early retirement annuity of $270 is 38 percent less than the monthly normal retirement benefit of $434, whereas a 15 percent reduction would have applied under the plan as in effect before the amendment. The notice also includes similar information for examples that show the smallest and largest reduction that the plan administrator thinks is likely to occur in the early retirement benefit. The notice also specifies the applicable interest rate, mortality table, and salary scale used in the example to calculate the early retirement reductions.

(ii) Conclusion. The information in the notice, as described in paragraphs (i)(C) and (D) of Example 4 and paragraph (i) of this Example 5, satisfies the requirements of paragraph (a)(3) of this Q&A-11 with respect to applicable individuals who are participants. The requirements of paragraph (a)(4) of this Q&A-11 are satisfied because, as noted in paragraph (i) of this Example 5, the notice describes the early retirement subsidy under the old formula and describes the estimated early retirement pension under the new formula in terms that can be readily compared to the old formula, *i.e.*, the notice states that the monthly early retirement pension of $270 is 38 percent less than the monthly normal retirement benefit of $434, whereas a 15 percent reduction would have applied under the plan as in effect before the amendment. The requirements of paragraph (a)(4)(ii) of this Q&A-11 that the examples include sufficient information to be able to determine the approximate magnitude of the reduction would also be satisfied if the notice instead directly stated the amount of the monthly early retirement pension that would be payable at age 59 under the old formula.

. . .

Q-14. What are the consequences if a plan administrator fails to provide section 204(h) notice?

A-14. (a) Egregious failures--(1) Effect of egregious failure to provide section 204(h) notice. Section 204(h)(6)(A) of ERISA provides that, in the case of any egregious failure to meet the notice requirements with respect to any plan amendment, the plan provisions are applied so that all applicable individuals are entitled to the greater of the benefit to which they would have been entitled without regard to the amendment, or the benefit under the plan with regard to the amendment. For a special rule applicable in the case of a plan termination, see Q&A-17(b) of this section.

(2) Definition of egregious failure. For purposes of section 204(h) of ERISA and this Q&A-14, there is an egregious failure to meet the notice requirements if a failure to provide required notice is within the control of the plan sponsor and is either an intentional failure or a failure, whether or not intentional, to provide most of the individuals with

most of the information they are entitled to receive. For this purpose, an intentional failure includes any failure to promptly provide the required notice or information after the plan administrator discovers an unintentional failure to meet the requirements. A failure to give section 204(h) notice is deemed not to be egregious if the plan administrator reasonably determines, taking into account section 4980F, section 204(h), these regulations, other administrative pronouncements, and relevant facts and circumstances, that the reduction in the rate of future benefit accrual resulting from an amendment is not significant (as described in Q&A-8 of this section), or that an amendment does not significantly reduce an early retirement benefit or retirement-type subsidy.

(3) Example. The following example illustrates the provisions of this paragraph (a):

   **Example.** (i) Facts. Plan A is amended to reduce significantly the rate of future benefit accrual effective January 1, 2003. Section 204(h) notice is required to be provided 45 days before January 1, 2003. Timely section 204(h) notice is provided to all applicable individuals (and to each employee organization representing participants who are applicable individuals), except that the employer intentionally fails to provide section 204(h) notice to certain participants until May 16, 2003.

   (ii) Conclusion. The failure to provide section 204(h) notice is egregious. Accordingly, for the period from January 1, 2003 through June 30, 2003 (which is the date that is 45 days after May 16, 2003), all participants and alternate payees are entitled to the greater of the benefit to which they would have been entitled under Plan A as in effect before the amendment or the benefit under the plan as amended.

(b) Effect of non-egregious failure to provide section 204(h) notice. If an egregious failure has not occurred, the amendment with respect to which section 204(h) notice is required may become effective with respect to all applicable individuals. However, see section 502 of ERISA for civil enforcement remedies. Thus, where there is a failure, whether or not egregious, to provide section 204(h) notice in accordance with this section, individuals may have recourse under section 502 of ERISA.

(c) Excise taxes. See section 4980F and Q&A-15 of this section for excise taxes that may apply to a failure to notify applicable individuals of a pension plan amendment that provides for a significant reduction in the rate of future benefit accrual or eliminates or significantly reduces an early retirement benefit or retirement-type subsidy, regardless of whether or not the failure is egregious.



29 C.F.R. § 2520.102-2

**Effective:[See Text Amendments]**

Code of Federal Regulations Currentness
Title 29. Labor
Subtitle B. Regulations Relating to Labor
Chapter XXV. Employee Benefits Security Administration, Department of Labor (Refs & Annos)
Subchapter C. Reporting and Disclosure Under the Employee Retirement Income Security Act of 1974
Part 2520. Rules and Regulations for Reporting and Disclosure (Refs & Annos)
Subpart B. Contents of Plan Descriptions and Summary Plan Descriptions

➡ **§ 2520.102-2 Style and format of summary plan description.**

(a) Method of presentation. The summary plan description shall be written in a manner calculated to be understood by the average plan participant and shall be sufficiently comprehensive to apprise the plan's participants and beneficiaries of their rights and obligations under the plan. In fulfilling these requirements, the plan administrator shall exercise considered judgment and discretion by taking into account such factors as the level of comprehension and education of typical participants in the plan and the complexity of the terms of the plan. Consideration of these factors will usually require the limitation or elimination of technical jargon and of long, complex sentences, the use of clarifying examples and illustrations, the use of clear cross references and a table of contents.

(b) General format. The format of the summary plan description must not have the effect to misleading, misinforming or failing to inform participants and beneficiaries. Any description of exception, limitations, reductions, and other restrictions of plan benefits shall not be minimized, rendered obscure or otherwise made to appear unimportant. Such exceptions, limitations, reductions, or restrictions of plan benefits shall be described or summarized in a manner not less prominent than the style, captions, printing type, and prominence used to describe or summarize plan benefits. The advantages and disadvantages of the plan shall be presented without either exaggerating the benefits or minimizing the limitations. The description or summary of restrictive plan provisions need not be disclosed in the summary plan description in close conjunction with the description or summary of benefits, provided that adjacent to the benefit description the page on which the restrictions are described is noted.



29 C.F.R. § 2520.104b-3

**Effective:[See Text Amendments]**

Code of Federal Regulations Currentness
Title 29. Labor
Subtitle B. Regulations Relating to Labor
Chapter XXV. Employee Benefits Security Administration, Department of Labor (Refs & Annos)
Subchapter C. Reporting and Disclosure Under the Employee Retirement Income Security Act of 1974
Part 2520. Rules and Regulations for Reporting and Disclosure (Refs & Annos)
Subpart F. Disclosure Requirements (Refs & Annos)

➡**§ 2520.104b-3 Summary of material modifications to the plan and changes in the information required to be included in the summary plan description.**

(a) The administrator of an employee benefit plan subject to the provisions of part 1 of title I of the Act shall, in accordance with § 2520.104b-1(b), furnish a summary description of any material modification to the plan and any change in the information required by section 102(b) of the Act and § 2520.102-3 of these regulations to be included in the summary plan description to each participant covered under the plan and each beneficiary receiving benefits under the plan. Except as provided in paragraph (d) of this section, the plan administrator shall furnish this summary, written in a manner calculated to be understood by the average plan participant, not later than 210 days after the close of the plan year in which the modification or change was adopted. This disclosure date is not affected by retroactive application to a prior plan year of an amendment which makes a material modification to the plan; a modification does not occur before it is adopted. For example, a calendar year plan adopts a modification in April, 1978. The modification, by its terms, applies retroactively to the 1977 plan year. A summary description of the material modification is furnished on or before July 29, 1979. A plan which adopts an amendment which makes a material modification to the plan which takes effect on a date in the future must disclose a summary of that modification within 210 days after the close of the plan year in which the modification or change is adopted. Under the authority of sections 104(a)(3) and 110 of the Act, a summary description of a material modification or change is not required to be disclosed if it is rescinded or otherwise does not take effect. For example, a calendar year plan adopts a modification in June, 1978. The modification, by its terms, becomes effective beginning in plan year 1979. Before the beginning of plan year 1979, the prospective modification is withdrawn. No summary of the material modification is required to be disclosed.

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

### Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1.    This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because:

&#8864;    this brief contains 13,981 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

□    this brief uses a monospaced typeface and contains [number] of lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6)

because:

&#8864;    this brief has been prepared in a proportionally spaced typeface using WordPerfect 14.0 in Times New Roman 14-point type, or

□    this brief has been prepared in a monospaced typeface using [name and version of word processing program] with [number of characters per inch and name of type style].

I certify that the information on this form is true and correct to the best of

my knowledge and belief formed after a reasonable inquiry.

s/ Stephen R. Bruce
Stephen R. Bruce

Attorney for Plaintiffs-Appellants

**Certificate of Digital Submission**

I hereby certify that a copy of the foregoing Plaintiffs-Appellants' Opening

Brief, as submitted in digital form, is an exact copy of the written document filed

with the Clerk and has been scanned for viruses using AVG AntiVirus version

9.0.925, and no viruses were found.

s/ Stephen R. Bruce
Stephen R. Bruce

Attorney for Plaintiffs-Appellants

### Certificate of Service

I hereby certify that on this 31st day of January, 2012, the foregoing

Plaintiffs-Appellants' Opening Brief was filed and served via CM/ECF electronic

filing, addressed to the following counsel:

| | |
|---|---|
| J. Richard Hammett | Paul J. Hickey |
| Scott M. Nelson | O'Kelley H. Pearson |
| Baker & McKenzie LLP | Hickey & Evans, LLP |
| Pennzoil Place, South Tower | P.O. Box 467 |
| 711 Louisiana, Suite 3400 | 1800 Carey Ave., Suite 700 |
| Houston, TX 77002-2746 | Cheyenne, WY 82003 |
| Scott.Nelson@bakermckenzie.com | phickey@hickeyevans.com |
| JRichard.Hammett@bakermckenzie.com | kpearson@hickeyevans.com |

I also certify that seven (7) copies of the Plaintiffs-Appellants' Opening

Brief were filed by FedEx next-day delivery to the Clerk of the Court of Appeals

for the Tenth Circuit and that two (2) copies of the Brief were served by FedEx

next-day delivery on counsel for Defendants-Appellees identified above.

I further certify that two copies of the Joint Appendix, Volumes I to XIII,

were filed by FedEx next-day delivery to the Clerk of the United States Court of

Appeals for the Tenth Circuit and that one copy of the Joint Appendix was served

by FedEx next-day delivery on counsel for Defendants-Appellees.

s/ Stephen R. Bruce
Stephen R. Bruce

Attorney for Plaintiffs-Appellants